UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

A.S., an individual,[1]                    §
                                           §
    Plaintiff,                             §
                                           §
v.                                         §   CIVIL ACTION NO. 3:23-CV-1039-B
                                           §
SALESFORCE, INC.,                          §
BACKPAGE.COM, LLC, and CARL                §
FERRER,                                    §
                                           §
    Defendants.                            §

<u>MEMORANDUM OPINION AND ORDER</u>

Before the Court is Defendant Salesforce, Inc. ("Salesforce")'s Motion to Dismiss Under

Rules 12(b)(2) and 12(b)(6) (Doc. 23). For the reasons stated below, the Court **GRANTS IN**

**PART** and **DENIES IN PART** the Motion. The Court **DISMISSES** Plaintiffs' Chapter 98A

claims against Salesforce **WITH PREJUDICE**.

## I.

## BACKGROUND

Plaintiffs are sex-trafficking victims. Doc. 25, Resp., 1. Plaintiffs claim that their individual

traffickers advertised and sold them for sex on Defendant Backpage.com, LLC ("Backpage")'s

online platform. *Id*. They further claim that Salesforce provided Backpage with the technology and

---

[1] On June 20, 2023, the Court consolidated the following cases with the above entitled cause: 3:23-CV-1040-B; 3:23-CV-1042-B; 3:23-CV-1044-B; 3:23-CV-1045-B; 3:23-CV-1046-B; 3:23-CV-1047-B; 3:23-CV-1048-B; 3:23-CV-1049-B; 3:23-CV-1050-B; 3:23-CV-1051-B; 3:23-CV-1052-B; 3:23-CV-1056-B; 3:23-CV-1057-B; 3:23-CV-1058-B; 3:23-CV-1059-B; 3:23-CV-1071-B; 3:23-CV-1110-B; 3:23-CV-1122-B; 3:23-CV-1352-B; 3:23-CV-1353-B. *See* Doc. 11, Mem. Op. & Order, 5–7. This case was designated as the lead case. *Id*. at 6.

services needed to expand Backpage's illicit business and evade detection from law enforcement. *Id*. Plaintiffs bring causes of action under Chapters 98 and 98A of the Texas Civil Practices and Remedies Code against Backpage and its former CEO, Carl Ferrer, as well as Salesforce (collectively "Defendants") for their role in Plaintiffs' trafficking. *Id*.

Backpage was an online marketplace used by sex traffickers to advertise and sell individuals, including Plaintiffs, for sex acts. Doc. 1-5, Pet., ¶¶ 6, 61-62, 115. From 2013 to 2015, "Backpage earned over 99% of its revenue from adult ads, a substantial percentage of which came directly from on-line prostitution and sex trafficking." *Id*. ¶ 9.  Specifically, sex traffickers used Backpage to "post" particular victims for sale, which enabled traffickers to "reach entirely new audiences, evade law enforcement, and maintain control of victims by transporting them quickly between locations thus maximizing profits far beyond traditional trafficking methods." *Id*. ¶¶ 60, 115. Since 2008, "Backpage . . . had been publicly identified by law enforcement, United States Attorneys General, and every United States Governor as the biggest and most notorious sex trafficking and prostitution promoting website in the United States." *Id*. ¶ 61.

In 2013, Backpage had difficulty scaling its operations "without operational support, marketing innovation, and guidance." *Id*. ¶ 64. Backpage thus sought out a partner that could "assist the vision of its growth as the leader in online sex sales as well as concealing such activity." *Id*. Backpage allegedly found such a partner in Salesforce. *See id*. ¶ 65. Salesforce is a Delaware technology company that maintains its principal place of business in California. *Id*. ¶ 28. Salesforce sells cloud-based customer relationship management ("CRM") software subscriptions to businesses throughout the United States. *See id*. ¶¶ 74, 79.

From 2013 to 2018, Salesforce and Backpage entered into a series of contracts in Texas, which allegedly "made possible the exponential growth of Backpage's business, sex trafficking[,]

and the selling of sex." *Id*. ¶ 65. Pursuant to those contracts, Salesforce assigned employees from its Texas-based office to meet with and provide technical support to Backpage in Texas. *Id*. ¶ 40. Specifically, Salesforce's Texas-based representatives allegedly worked with Backpage to build out Backpage's CRM software in order "to promote, develop, and grow its internet based online selling of sex, sex trafficking, and compelled prostitution." *Id*. ¶ 83. Plaintiffs further allege that "Salesforce personally assisted Backpage with the integration and migration of its data onto the Salesforce CRM technology platform." *Id*. ¶ 79.

Plaintiffs claim that they were trafficked through Backpage with the help of Salesforce's technology and services. *See id*. ¶¶ 113–17. According to Plaintiffs, Salesforce's software enabled "Backpage [to] collect[] detailed and in-depth customer data about the sex traffickers using Backpage, monitor[] data about sex traffickers, streamlin[e] communications with those sex traffickers, and market[] . . . to sex traffickers." *Id*. ¶ 131. Salesforce also allegedly "facilitated and supported Backpage's analysis of customer and user activity, surveillance of customers, and collection of information about its users, including platform and social media interactions and customer preferences, enabling Backpage to more effectively target traffickers and sex buyers." *Id*. Plaintiffs claim that "[b]y assisting Backpage in marketing itself to sex traffickers, Salesforce directly connected many sex traffickers to Backpage, encouraged them to use Backpage to traffic their Victims, and expanded the venture engaged in the trafficking of persons." *Id*.

Lead Plaintiff A.S. initiated the present litigation against Defendants in Texas state court on May 1, 2023. *See generally id*. Salesforce removed the case to federal court on May 10, 2023. Doc. 1, Notice of Removal. The basis for removal was diversity jurisdiction under 28 U.S.C. § 1332. *Id*. ¶¶ 12–13. On June 20, 2023, the Court consolidated Lead Plaintiff's case with several other substantially similar cases. Doc. 11, Order. Plaintiffs asserts claims under Chapters 98 and 98A of

the Texas Civil Practices and Remedies Code against each Defendant. Doc. 1-5, Pet., ¶¶ 118–167. As pertinent to the present Order, Plaintiffs claim that Salesforce is liable under Chapter 98 because it knowingly benefited from its participation in a venture that trafficked Plaintiffs. *Id.* ¶¶ 122–33. Plaintiffs further allege that Salesforce is liable under Chapter 98A because its conduct was violative of several provisions of Chapter 43 of the Texas Penal Code and resulted in the compelled prostitution of Plaintiffs. *Id.* ¶¶ 134–148.

On September 25, 2023, Salesforce filed the Motion to Dismiss (Doc. 23) presently before the Court. Salesforce's Motion is fully briefed and ripe for review. The Court considers it below.

## II.

### LEGAL STANDARDS

Under Federal Rule of Civil Procedure 8(a)(2), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Rule 12(b)(6) authorizes dismissal of a plaintiff's complaint for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). In considering a Rule 12(b)(6) motion to dismiss, "[t]he court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (citation omitted). But the court will "not look beyond the face of the pleadings to determine whether relief should be granted based on the alleged facts." *Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999).

To survive a motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). When well-pleaded facts fail to meet this standard, "the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id.* at 679 (internal quotations and alterations omitted).

## III.

## ANALYSIS

Plaintiffs assert two state-law claims against Salesforce under Chapters 98 and 98A of the Texas Civil Practices Code. *See* Doc. 1-5, Pet., ¶¶ 122–148. Their Chapter 98 claim is brought under § 98.002(a), and their Chapter 98A claim is brought under § 98A.002(a)(2). *Id.* Salesforce argues that those claims should be dismissed for four reasons. *See* Doc. 24, Mot. Br., 2–4. First, Salesforce maintains that this Court lacks personal jurisdiction over it. *Id.* at 2. Second, it argues that Plaintiffs' claims are barred by § 230 of the Communications Decency Act ("CDA"). *Id.* at 2–3. Third, it contends that neither Chapter 98 nor Chapter 98A can be applied to redress extraterritorial injuries. *Id.* at 3. Fourth, and finally, Salesforce argues that Plaintiffs failed to plead facts giving rise to the plausible inference that Salesforce engaged in actionable conduct under either § 98.002(a) or § 98A.002(a)(2). *Id.* at 3–4.

At the outset, the Court notes that it previously rejected Salesforce's first two arguments—personal jurisdiction and CDA immunity—in another matter pending before this Court, *S.M.A. v. Salesforce*, No. 3:23-cv-0915-B (N.D. Tex. filed May 1, 2023). For purposes of these arguments, there is virtually no factual distinction between *S.M.A. v. Salesforce* and the present case. *Compare* Complaint, *S.M.A. v. Salesforce*, No. 3:23-cv-0915-B (N.D. Tex. May 1, 2023), ECF No. 1, *with* Doc. 1-5, Pet. Further, Salesforce is represented by the same counsel in this case as it is in *S.M.A.*

*v. Salesforce*, and Salesforce's briefing on the personal jurisdiction and CDA issues in that case is substantially similar to its briefing here. *Compare* Mot. Dismiss Br., *S.M.A. v. Salesforce*, No. 3:23-cv-0915-B (N.D. Tex. June 30, 2023), ECF No. 26, 8–25, *with* Doc. 24, Mot. Br., 6–20.

In *S.M.A.*, this Court found that Salesforce was subject to personal jurisdiction in Texas and that Salesforce was not entitled to immunity under the CDA. Mem. Op. & Order, *S.M.A. v. Salesforce*, 3:23-cv-0915-B (N.D. Tex. March 28, 2024), ECF No. 48. The Court stands by its ruling in *S.M.A.* and thus reaches the same conclusion here. Therefore, the Court **DENIES** Salesforce's Motion to Dismiss under Rule 12(b)(2) and on CDA immunity grounds for the reasons articulated in its March 28, 2024 Order in *S.M.A. v. Salesforce. See* Mem. Op. & Order, 3:23-cv-0915-B (N.D. Tex. March 28, 2024), ECF No. 48.

The Court considers Salesforce's remaining arguments in support of dismissal below. The Court ultimately concludes that, while their Chapter 98 claim survives, Plaintiffs' claim under Chapter 98A should be dismissed.

A.      *Chapter 98 Claim*

Plaintiffs first bring a claim against Salesforce under Chapter 98 of the Texas Civil Practices and Remedies Code. Doc. 1-5, Pet., ¶¶ 122–133. Section 98.002(a) of that Code provides that "[a] defendant who engages in the trafficking of persons or who intentionally or knowingly benefits from participating in a venture that traffics another person is liable to the person trafficked . . . for damages arising from the trafficking of that person by the defendant or venture." TEX. CIV. PRAC. & REM. CODE § 98.002(a). Plaintiffs contend that Salesforce participated in a venture that trafficked them and thus is liable under § 98.002(a). Doc. 25, Resp., 1.

Salesforce argues that Plaintiffs' Chapter 98 claim should be dismissed under Rule 12(b)(6) for two reasons. *See* Doc. 24, Mot. Br., 20–29. First, Salesforce argues that § 98.002(a) does not,

as a matter of statutory construction, apply to redress out-of-state injuries. *Id.* at 20–26. Thus, Salesforce contends, because Plaintiffs here were allegedly trafficked—and thus injured—outside of Texas, § 98.002(a) affords them no relief. *See* Doc. 26, Reply, 10–11. Second, Salesforce argues that Plaintiffs failed to plead sufficient facts which render plausible the inference that Salesforce "participated in a venture" within the meaning of the statute. *See* Doc. 24, Mot. Br., 26–29. The Court addresses each argument in turn but ultimately concludes that neither justifies dismissal of Plaintiffs' § 98.002(a) claims at this stage.

### 1.    Extraterritoriality

Salesforce first argues that Plaintiffs seek to apply § 98.002(a) beyond its permissible scope. *See* Doc. 24, Mot. Br., 20–26. Specifically, Salesforce takes issue with Plaintiffs' attempt to enforce a Texas statute against Salesforce's Texas activity because Plaintiffs were injured in another state. Doc. 26, Reply, 10–11. Such an application of Chapter 98, says Salesforce, is violative of the presumption against extraterritoriality, which generally precludes enforcement of a state law beyond the jurisdiction of the enacting state absent a clear indication of legislative intent to the contrary. *See* Doc. 24, Mot. Br., 20–26.

To the extent the facts alleged in Plaintiffs' pleadings implicate an extraterritorial application of Chapter 98, the Court concludes that the presumption against extraterritoriality is overcome in this case.

Whenever Texas passes a law, it is presumed to only apply in Texas. *See Willis v. Missouri Pac. Ry. Co.*, 61 Tex. 432, 434 (1884). This presumption, however, is rebuttable. *See, e.g., Kubbernus v. ECAL Partners, Ltd.*, 574 S.W.3d 444, 476 (Tex. App.—Houston [14th Dist.] 2018, pet. denied); *see also Coca-Cola Co. v. Harmar Bottling Co.*, 218 S.W.3d 671, 682 (Tex. 2006). That

said, a statute will only be given extraterritorial effect if it was enacted pursuant to the constitutional exercise of legislative authority and the enacting body acted pursuant to that authority. *See Marmon v. Mustang Aviation, Inc.*, 430 S.W.2d 182, 186 (Tex. 1968) ("Admittedly, there are two questions involved, namely, the Extent of the legislative power, and the Intention of the legislative authority."); *see also BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 571 (1996).

Here, Salesforce does not dispute that the Texas legislature *could* constitutionally extend the reach of § 98.002(a) to cover some extraterritorial conduct. *Cf.* Doc. 24, Mot. Br., 20–26. It instead argues that the Texas legislature did not *intend* for § 98.002(a) to be given extraterritorial effect. *See id.*

Whether § 98.002(a) applies to the extraterritorial facts of this case must be discerned from traditional tools of statutory interpretation. *See Coca-Cola Co.*, 218 S.W.3d at 682; *Marmon*, 430 S.W.2d at 187. However, it has long been the rule in Texas that the legislature will not be presumed to have intended an extraterritorial application: "Unless the intention to have a statute operate beyond the limits of the state or country is clearly expressed or indicated by its language, purpose, subject matter, or history, no legislation is presumed to be intended to operate outside the territorial jurisdiction of the state or country enacting it." *Marmon*, 430 S.W.2d at 187 (citations omitted).

Applying this interpretative rule in *Marmon v. Mustang Aviation, Inc.*, the Supreme Court of Texas held that Texas's wrongful death statute was inapplicable in a case brought by the family members of victims who perished in a plane crash in Colorado en route to Texas. 430 S.W.2d at 187. Not only did the wrongful death statute lack express language indicating an intent that it be applied extraterritorially, the Court explained, but "it ha[d] been repeatedly held by the Texas courts that it does not." *Id.* And while the Texas legislature had made several revisions to the wrongful death statute after it had been held to have no extraterritorial effect, the legislature never

amended the statute to overrule these holdings. *Id.* Given the presumption against extraterritoriality and the legislature's repeated refusal to overrule prior precedent, the Court concluded that the Texas wrongful death statute did not apply to the family members' action. *Id.*

However, the absence of express language permitting a statute's extraterritorial application is not determinative if there is other evidence that the legislature intended to give a statute extraterritorial reach. Thus, in *Citizens Ins. Co. of America v. Daccach*, 217 S.W.3d 430, 444 (Tex. 2007), the Supreme Court of Texas held that the Texas Securities Act ("TSA")'s registration provision applied to the sale of securities to out-of-state residents notwithstanding the lack of express language in the TSA permitting such an application. Regulations interpreting the registration provision, the purpose of the TSA, and the history leading to its enactment, the Court explained, all demonstrated an intent to apply the registration requirement to the in-state sales of securities to out-of-state residents sufficient to overcome the presumption against extraterritoriality. *See id.* at 444–46.

Chapter 98 is more similar to the registration provision at issue in *Daccach* than it is to the wrongful death statute at issue in *Marmon*. As in *Daccach*, while Chapter 98 does not expressly state that it applies extraterritorially, other indicators—namely, the statute's history and purpose— clearly demonstrate the legislature's intent that § 98.002(a) extend to at least some out-of-state activities. *See* 217 S.W.3d at 444–46. And unlike *Marmom*, there is no persuasive evidence suggesting that the legislature affirmatively intended to limit the application of Chapter 98 to redress only in-state injuries. *See* 430 S.W.2d at 187.

Before § 98.002(a) expressly created a civil cause of action for victims of human trafficking, Texas had proscribed trafficking as a criminal offense under Chapter 20A of the Texas Penal Code. *See* Act of May 30, 2007, 80th Leg., R.S., ch. 258, § 16.02, sec. 20A.02, 2007 Tex. Gen. Laws 367,

392 (amended 2009) (current version at TEX. PENAL CODE § 20A.02). Prior to Chapter 98's enactment, it was a crime under Chapter 20A to "(1) knowingly traffic[] another person with the intent or knowledge that the trafficked person will engage in forced labor or services; or (2) intentionally or knowingly benefit[] from participating in a venture that involves an activity described by Subdivision (1)." *Id.* And a person who participated in a venture in Texas could be criminally prosecuted even if the venture trafficked a victim outside of the state. *See* TEX. PENAL CODE § 1.04(a)(1); *Rodriguez v. State*, 146 S.W.3d 674, 677 (Tex. Crim. App. 2004); *Lee v. State*, 537 S.W.3d 924, 926 (Tex. Crim. App. 2017) ("Texas has jurisdiction over an offense if either a conduct element or a result element occurs inside the state."). When Chapter 98 was enacted in 2009, it specifically incorporated Chapter 20A into its civil liability provisions. *See* Act of June 19, 2009, 81st Leg., R.S., ch. 309, § 1, 2009 Tex. Gen. Laws 830 (current version at TEX. CIV. PRAC. & REM. CODE § 98.001, *et seq.*). Section 98.002(a) imposed liability on, among others, those who "engage[] in the trafficking of persons," TEX. CIV. PRAC. & REM. CODE § 98.002(a), and the legislature defined "trafficking of persons" as "conduct that constitutes an offense under Chapter 20A, Penal Code," *id.* § 98.001.

In enacting Chapter 98, the legislature was presumably aware that a person can commit an offense under Chapter 20A—and be convicted of the same—where he participates in Texas even through the victim is physically trafficked in a different state. *See* TEX. PENAL CODE §§ 1.04(a)(1), 20A.02(a); *see also Rodriguez*, 146 S.W.3d at 677. And with this awareness, the legislature passed a law—Chapter 98—which imposes civil liability to the full extent that one's conduct is criminally punishable under Chapter 20A.[2] *See* TEX. CIV. PRAC. & REM. CODE § 98.002(a). What's more, the

---

[2] It appears that Chapter 98 actually goes a step further than Chapter 20A. A person is subject to civil liability under § 98.002(a) if he (1) "engages in the [conduct that constitutes an offense under Chapter

legislature specifically instructed that Chapter 98 "be liberally construed and applied to promote its underlying purpose to protect persons from human trafficking and provide adequate remedies to victims of human trafficking." *Id*. § 98.006. The necessary implication from this history and purpose is that the legislature intended § 98.002(a) to have at least some extraterritorial application: if participating in a venture in Texas that traffics a victim elsewhere is conduct that constitutes an offense under Chapter 20A, and if conduct that constitutes an offense under Chapter 20A gives rise to civil liability under Chapter 98, it follows that participating in a venture in Texas that traffics a person elsewhere could also give rise to civil liability under Chapter 98.

Indeed, any other construction would lead to absurd results. *See Carreras v. Marroquin*, 339 S.W.3d 68, 73 (Tex. 2011) ("We . . . interpret statutes to avoid an absurd result."). A person could participate in a venture in Texas which traffics one person in Oklahoma; that person could then be criminally convicted for violating Chapter 20A as a participant in a venture that traffics another; however, the sole trafficking victim would be afforded no redress against our hypothetical participant under Chapter 98, even though the participant was found guilty of engaging "conduct that constitutes an offense under Chapter 20A" and thus squarely falls within the class of persons whom the Texas legislature sought to hold liable with § 98.002(a). *See* TEX. CIV. PRAC. & REM. CODE § 98.001. The Court is skeptical that the legislature intended such an absurd result, especially considering this result would be manifestly antithetical to statute's express purpose, which is "to protect persons from human trafficking and provide adequate remedies to victims of human trafficking." *Id*. § 98.006.

20]"; or (2) "knowingly benefits from participation in a venture which traffics another." TEX. CIV. PRAC. & REM. CODE §§ 98.001, 98.002(a). To avoid rendering portions of § 98.002(a), "knowingly benefits from participation in a venture" must mean something different than conduct which is violative of Chapter 20A. In this regard, § 98.002(a) seems to extend liability beyond that contemplated in Chapter 20A.

While Salesforce argues that *Coca-Cola Co. v. Harmar Bottling Co.*, 218 S.W.3d 671 (Tex. 2006) forecloses the application of § 98.002(a) to extraterritorial injuries, the Court is not convinced. *See* Doc. 24, Mot. Br., 21–23. In *Coca-Cola Co.,* plaintiffs, distributors of the carbonated soft drink Royal Crown Cola in the "Ark–La–Tex region," brought claims against The Coca-Cola Company and its distributors for, *inter alia*, violations of the Texas Free Enterprise and Antitrust Act ("TFEAA"). *Id.* at 675–76. Plaintiffs' suit alleged that marketing agreements between Coca-Cola and various soft drink retailers (e.g., convenience stores or grocery markets) that operated in Louisiana, Arkansas, and Oklahoma were unlawful under of the TFEAA. *Id.* Plaintiffs argued "that the injuries they incurred outside Texas were actionable under the TFEAA because those injuries resulted from Coca-Cola's conduct within Texas, specifically, its business and policy decisions made at its offices in Texas and contract negotiations often handled in Texas." *Id.* at 680. The Supreme Court of Texas disagreed, primarily because plaintiffs' purported application of the TFEAA would not further the statute's purpose, which was "to maintain and promote economic competition in trade and commerce occurring wholly or partly within the State of Texas and to provide the benefits of that competition to consumers in the state." *Id.* at 683 (quoting TEX. BUS. & COM. CODE § 15.04)). The Court emphasized that plaintiffs had not shown how "compensating them for injur[ies] [they] suffered in Arkansas, Louisiana, and Oklahoma will promote competition in Texas or benefit Texas consumers." *Id.*  Nor did the fact that some of the conduct giving rise to the injury occurred in Texas bring Plaintiffs' proposed application of the statute within its express purpose: "The fact that Coke made decisions in Texas regarding the [contracts] used in other states, negotiated some of those [contracts] in Texas, and used the same [contracts] in Texas does not bring redress of the resulting injury in the other states within the TFEAA's purpose." *Id.*

While there are facial similarities between this case and *Coca-Cola Co.*, that case is distinguishable in a key respect—the TFEAA's express purpose was the protection of *Texas* businesses and *Texas* consumers specifically. *See* TEX. BUS. & COM. CODE § 15.04 ("The purpose of this Act is to maintain and promote economic competition in trade and commerce occurring wholly or partly within the *State of Texas* and to provide the benefits of that competition to consumers in the *state*." (emphasis added)). Redressing antitrust injuries sustained outside of Texas, the Court reasoned, did not further this purpose—and thus the statute did not apply to such injuries—because anticompetitive conduct in Louisiana or Arkansas, for example, had little effect on competition in Texas. *See Coca-Cola Co.*, 218 S.W.3d at 683. Chapter 98's express purpose, on the other hand, extends to the protection of persons and victims *generally*, not Texans specifically: "This chapter shall be liberally construed and applied to promote its underlying purpose to protect *persons* from human trafficking and provide adequate remedies to *victims* of human trafficking." TEX. CIV. PRAC. & REM. CODE § 98.006 (emphasis added). The application of § 98.002(a) to out-of-state injuries caused by in-state conduct would further the purpose of "protect[ing] persons from human trafficking" and "provid[ing] adequate remedies to victims of human trafficking." *Id.*; *see Coca-Cola Co.*, 218 S.W.3d at 683. For this reason, *Coca-Cola Co.* is inapposite.

In sum, the history and purpose of § 98.002(a) persuade the Court that it may be applied to the facts alleged this case, where the alleged acts of participation in a venture occurred in this state resulted in the trafficking of victims in other states. The cases that Salesforce cites do not dictate a different result.

2.      12(b)(6)

Even if Chapter 98 applies extraterritorially, Salesforce argues, dismissal is nevertheless warranted because Plaintiffs failed to plead a plausible claim under TEX. CIV. PRAC. & REM. CODE § 98.002(a). As relevant here, § 98.002(a) imposes civil liability on those "who intentionally or knowingly benefit[] from participating in a venture that traffics another person." Salesforce contends that Plaintiffs failed to plead facts sufficient to permit the inference that Salesforce participated in a trafficking venture. *See* Doc. 24, Mot. Br., 26–29. The Court disagrees.

To establish that Salesforce "participat[ed] in a venture" under § 98.002(a), Plaintiffs must allege facts plausibly showing that Salesforce committed "an overt act beyond mere negative acquiescence . . . [that is] designed to aid in the success of the venture." *In re Facebook, Inc.*, 625 S.W.3d 80, 97 (Tex. 2021) (citations omitted).

 In *In re Facebook*, the Supreme Court of Texas distinguished between the kinds of allegations which demonstrate mere "negative acquiescence" and those which constitute "overt acts." 625 S.W.3d at 97–98. In that case, plaintiffs were allegedly trafficked by individuals they met on social media platforms owned by Facebook; they claimed that Facebook facilitated their trafficking and thus was liable as a participant under § 98.002(a). *Id*. at 85. On the one hand, the Court found plaintiffs' allegations regarding Facebook's failure to protect its users through the use of "warnings, restrictions on eligibility for accounts, removal of postings, etc." amounted to nothing more than the provision of "neutral tools" and thus were insufficient to support a claim under § 98.002(a). *See id*. at 93, 97. However, plaintiffs had also alleged that Facebook engaged in certain "overt acts," such as "us[ing] the detailed information it collects and buys on its users to direct users to persons they likely want to meet and, in doing so, facilitate[d] human trafficking by identifying potential targets, like [p]laintiffs, and connecting traffickers with those individuals." *Id*.

at 97–98 (quotations and alterations omitted). Allegations of this sort, the Court held, suggested that Facebook took "affirmative acts . . . to encourage unlawful conduct on its platforms" and thus participated in a venture for purposes of § 98.002(a). *Id.* at 98.

The allegations in this case are more than sufficient to show that Salesforce participated in a venture with Backpage under the *In re Facebook* standard, as Plaintiffs pleaded that Salesforce took affirmative acts that encouraged Backpage's wrongdoing. For example, Plaintiffs allege that in 2015, Backpage "was in fear of imminent law enforcement seizure[,] necessitating the need for duplicate copy of the Backpage system for use overseas." Doc. 1-5, Pet., ¶ 106. Aware of this fear, and the reason therefor, Plaintiffs claim that "Salesforce affirmatively assisted, supported, and facilitated Backpage in moving a duplicate copy of its system overseas for the purpose of evading law enforcement scrutiny." *Id.* ¶ 105. And when credit card companies began refusing to process transactions on Backpage's website due to the illicit nature of its business, "Salesforce agreed to alter Backpage's payment structure in an attempt to help them stay afloat as they searched for solutions." *Id.* ¶ 108. Plaintiffs also claim that Salesforce "assisted . . . Backpage's creation of direct marketing campaigns, coupled with information gathering such as tracking mouse clicks and tracking the internet activity of sex traffickers and customer analytics to help Backpage, automate, manage, and track the effectiveness of its marketing efforts." *Id.* ¶ 131. And Plaintiffs further aver that "Salesforce assisted Backpage in creating connections with more sex traffickers, generating continuous pipeline of sex traffickers directed towards Backpage, closing sales with more sex traffickers, and encouraging sex traffickers to use Backpage to sell their victims." *Id.*

To be sure, these are not the only allegations in Plaintiffs' Petition which establish that Salesforce took certain overt acts to facilitate the success of the venture. But for present purposes, they are more than sufficient to show that Salesforce crossed the line from merely providing

"neutral tools" to engaging in "affirmative acts" designed to encourage wrongdoing by Backpage. *See In re Facebook*, 625 S.W.3d at 97–98.

Salesforce, however, argues that it is not enough for purposes of § 98.002(a) that Plaintiffs alleged that Salesforce participated in a venture with Backpage. In Salesforce's view, Plaintiffs must allege that it participated in the *sex trafficking aspect* of the venture, rather than some other, unrelated (and perhaps benign) aspect of the same venture. Doc. 26, Reply, 12–13. And here, Salesforce argues, "[a]ll the wrongful conduct that directly injured Plaintiffs was committed by their traffickers, as facilitated through classified ads posted by the traffickers on Backpage's website." Doc. 24, Mot. Br., 27. Assuming without deciding that Salesforce is correct that Plaintiffs are required to show that Salesforce participated in the sex trafficking aspect of the venture, the Court concludes that Plaintiffs have made such a showing here.

In addition to Plaintiffs' individual, street-level traffickers, the allegations plausibly establish that Backpage's conduct constituted trafficking under Chapter 20A of the Texas Penal Code. As relevant here, a person commits the offense of trafficking of persons under § 20A.02(a) if he, *inter alia*, knowingly:

> (3) traffics another person and, through force, fraud, or coercion, causes the trafficked person to engage in conduct prohibited by:
> (A) Section 43.02 (Prostitution);
> (B) Section 43.03 (Promotion of Prostitution);
> (B-1) Section 43.031 (Online Promotion of Prostitution);
> (C) Section 43.04 (Aggravated Promotion of Prostitution);
> (C-1) Section 43.041 (Aggravated Online Promotion of Prostitution); or
> (D) Section 43.05 (Compelling Prostitution); [or]
> (4) receives a benefit from participating in a venture that involves an activity described by Subdivision (3)

TEX. PENAL CODE § 20A.02(a)(3)–(4). Here, the allegations, taken as true, demonstrate that Backpage violated Subsection (4) by benefitting from its participation in a venture with individual

traffickers who violated Subsection (3). *See generally* Doc. 1-5, Pet., ¶¶ 150–167. Plaintiffs first allege that their individual traffickers violated Subsection (3) when they "sold [Plaintiffs] for sex acts by force, fraud, or coercion." Doc. 1-5, Pet., ¶ 113. They then allege that Backpage violated Subsection (4) by entering into agreements with Plaintiffs' individual traffickers to help promote the forced prostitution of Plaintiffs. *See* Doc. 1-5, Pet., ¶¶ 150–67.

Given that Backpage itself is alleged to have engaged in the trafficking of Plaintiffs, *see* TEX. PENAL CODE § 20A.02(a)(4), Salesforce, through its alleged provision of technology and services to Backpage, was directly involved with one of Plaintiffs' traffickers—Backpage. And Salesforce is alleged to have directly facilitated the sex trafficking aspect of Backpage's business—i.e., participating in a venture with Plaintiffs' individual street-level traffickers—by enabling Backpage to grow its relationships with the individual traffickers. *See, e.g.*, Doc. 1-5 Pet., ¶ 131 ("Salesforce facilitated and supported Backpage's analysis of customer and user activity, surveillance of customers, and collection of information about its users, including platform and social media interactions and customer preferences, *enabling Backpage to more effectively target traffickers and sex buyers*." (emphasis added)). As such, Salesforce's acts of participation directly furthered the sex trafficking aspect of the venture between Backpage and Salesforce. *See* TEX. PENAL CODE § 20A.02(a)(4).

In sum, Plaintiffs have plausibly alleged that Salesforce engaged in affirmative acts designed to further the success of its venture with Backpage. This is sufficient to show that Salesforce participated in a venture which trafficked Plaintiffs.

* * *

Salesforce argued that Plaintiffs' § 98.002(a) claims should be dismissed under Rule 12(b)(6) for two reasons—that Chapter 98 did not apply to redress out-of-state injuries which are

caused by in-state conduct and that Plaintiffs failed to plausibly plead their claim. The Court disagrees with Salesforce on both counts. Accordingly, Salesforce's Motion is **DENIED** with respect to Plaintiffs' Chapter 98 claims.

B.     *Chapter 98A Claim*

Plaintiffs also bring a claim against Salesforce under Chapter 98A of the Texas Civil Practices and Remedies Code. *See* Doc. 1-5, Pet., ¶¶ 134–48. Section 98A.002(a)(2) creates a right of action for victims of "compelled prostitution" against anyone who "knowingly or intentionally engages in promotion of prostitution, online promotion of prostitution, aggravated promotion of prostitution, or aggravated online promotion of prostitution that results in compelling prostitution with respect to the victim." TEX. CIV. PRAC. & REM. CODE § 98A.002(a)(2). Plaintiffs claim that Salesforce is liable under Chapter 98A because it engaged in each of the four acts listed, and as a result, Plaintiffs were compelled into prostitution. *See* Doc. 1-5, Pet., ¶¶ 134–148.

Salesforce moves to dismiss Plaintiffs Chapter 98A claims for the same reasons it sought dismissal of their Chapter 98 claims, namely that Chapter 98A does not apply extraterritorially and that, even if it does, Plaintiffs have failed to plead a claim for relief. *See* Doc. 24, Mot. Br., 20–26, 29–30. The Court does not address Salesforce's extraterritoriality argument because it agrees that Plaintiffs have not stated a claim.

At a high level, § 98A.002(a)(2) claims consist of two elements. First, a plaintiff must show that a defendant intentionally or knowingly engaged in one of four acts: (1) "promotion of prostitution," (2) "online promotion of prostitution," (3) "aggravated promotion of prostitution," or (4) "online aggravated promotion of prostitution." TEX. CIV. PRAC. & REM. CODE

§ 98A.002(a)(2). Second, a plaintiff must show that the defendant's commission of one of these four acts "result[ed] in compelling prostitution with respect to the [plaintiff]." *Id.*

Here, the Court concludes that Plaintiffs have failed to plead the first element of their § 98A.002(a)(2) claim. That is, the Petition does not contain allegations of fact which give rise to the plausible inference that Salesforce engaged in "promotion of prostitution, online promotion of prostitution, aggravated promotion of prostitution, or aggravated online promotion of prostitution." *Id.* As such, dismissal under Rule 12(b)(6) is warranted.

### 1.   Promotion of Prostitution

Plaintiffs failed to allege that Salesforce engaged in the "promotion of prostitution." The term "promotion of prostitution" in § 98A.002(a)(2) means "conduct that constitutes an offense under Section 43.03, Penal Code." TEX. CIV. PRAC. & REM. CODE § 98A.001(5). Section 43.03 of the Texas Penal Code, in turn, provides that a person commits the offense of promotion of prostitution if he, among other things, knowingly "receives money or other property pursuant to an agreement to participate in the proceeds of prostitution." TEX. PENAL CODE § 43.03(a)(1). Here, there is no real dispute that Salesforce received money pursuant to an agreement with Backpage. *Cf.* Doc. 24, Mot. Br., 30. Thus, the only issue is whether the agreement between Backpage and Salesforce constituted "an agreement to participate in the proceeds of prostitution." TEX. PENAL CODE § 43.03(a)(1).

Plaintiffs contend that Salesforce violated § 43.03(a)(1) because it knew it was being paid with money that Backpage had earned from sex traffickers. *See* Doc. 25, Resp., 30. As Plaintiffs allege in their Petition, "[b]y promoting the selling of sex and sex trafficking, Backpage made its money from traffickers and the sellers of sex. Backpage used that money to continue its purchases and subscriptions with Salesforce." Doc. 1-5, Pet., ¶ 100. Therefore, Plaintiffs argue, "by accepting

money through its contract with Backpage, Salesforce agreed to participate in the proceeds of prostitution." Doc. 25, Resp., 30. The Court disagrees.

At the outset, the Court notes that the Texas judiciary has not had ample occasion to interpret the precise contours of § 43.03(a)(1). This Court's research yielded a mere 48 cases in which this statute has been cited, a majority of which were decided prior to 2000. Fewer still are the number of cases interpreting what constitutes "an agreement to participate in the proceeds of prostitution." TEX. PENAL CODE § 43.03(a)(1). And of the limited number of cases that do address what it means to agree to "participate in the proceeds of prostitution," none appear to be on point with the factual allegations here. *See Garrett v. State*, 566 S.W.2d 605, 607 (Tex. Crim. App. [Panel Op.] 1978); *Duffield v. State*, 643 S.W.2d 139, 140 (Tex. Crim. App. [Panel Op.] 1982); *Benton v. City of Houston*, 605 S.W.2d 679, 682 (Tex. Civ. App.—Houston [1st Dist.] 1980, no writ.); *Rollerson v. State*, No. 05-95-01678-CR, 1997 WL 457472, at *3 (Tex. App.—Dallas Aug. 11, 1997, pet. denied); *Lowry v. State*, No. 11-08-00095-CR, 2009 WL 4696900, at *2 (Tex. App.—Eastland Dec. 3, 2009, pet. ref'd); *Jimenez v. State*, No. 14-18-00364-CR, 2019 WL 7372846, at *4 (Tex. App.—Houston [14th Dist.] Dec. 31, 2019, pet. denied).

In light of the relative dearth of caselaw pertaining to the relevant portion of § 43.03(a)(1), the Court largely writes on a blank slate in interpreting "an agreement to participate in the proceeds of prostitution." In Texas, statutory construction beings with the statute's language. *State v. Shumake*, 199 S.W.3d 279, 284 (Tex. 2006). Texas courts look "to the plain meaning of the text as the sole expression of legislative intent, unless the Legislature has supplied a different meaning by definition, a different meaning is apparent from the context, or applying the plain meaning would lead to absurd results." *Abutahoun v. Dow Chem. Co.*, 463 S.W.3d 42, 46 (Tex. 2015) (citations omitted); *see also Jaster v. Comet II Const., Inc.*, 438 S.W.3d 556, 563 (Tex. 2014). ("To

determine its common, ordinary meaning, [courts] look to a wide variety of sources, including dictionary definitions, treatises and commentaries, . . . prior constructions of the word in other contexts, the use and definitions of the word in other statutes and ordinances, and the use of the words in our rules of evidence and procedure.").

As used in § 43.03(a)(1), the plain meaning of the term "participate" is "to have a part or share with a person, in . . . a thing." *Participate*, OXFORD ENGLISH DICTIONARY (Rev. 2005 ed.); *see also Participate*, MERRIAM-WEBSTER DICTIONARY (online ed.) (defining "Participate" as "to have a part or share in something"); *Participate*, AMERICAN HERITAGE DICTIONARY (online ed.) (defining "Participate" as "[t]o share in something"). And the term "proceeds" is commonly understood to mean "that which is obtained or gained by any transaction or process; an outcome; esp. the money obtained from an event, activity, or enterprise." *Proceeds*, OXFORD ENGLISH DICTIONARY (Rev. 2005 ed.); *Proceeds*, BLACK'S LAW DICTIONARY (12th ed. 2024) (defining "Proceeds" as "the amount of money received from a sale."). Finally, the term "prostitution" is defined in the Texas Penal Code as "knowingly offer[ing] or agree[ing] to receive a fee from another to engage in sexual conduct." TEX. PENAL CODE § 43.02(a); *see id.* § 43.01(2). Based on the foregoing, the Court understands "an agreement to participate in the proceeds of prostitution" in § 43.03(a)(1) to mean an agreement to share in the money derived from the offer to sell or purchase sex.

Here, the allegations fail to establish that Salesforce was a party to an agreement to participate in the proceeds of prostitution. According to Plaintiffs, Backpage first sold advertisements to street-level traffickers; the street-level traffickers then placed advertisements on Backpage's platform selling their victims for sex. *See* Doc. 1-5, Pet., ¶¶ 9, 62, 115. However, it is insufficient for purposes of § 43.03(a)(1) that Salesforce agreed to share in the money derived from this first step—i.e., Backpage's sale of advertisements to street-level traffickers. This is because

Backpage's sale of advertisements does not constitute "prostitution" within the meaning of the statute as this did not involve the offer or agreement to exchange money for sex. *See* TEX. PENAL CODE § 43.02(a). As such, any money derived from the sale of advertisements cannot constitute "the proceeds of prostitution." *Id.* § 43.031(a)(1). Plaintiffs must instead show that Salesforce agreed to share in the money derived from the second step—i.e., the street-level traffickers' placing the advertisements on Backpage. *See id.*

Plaintiffs have not shown that Salesforce agreed to share in the money derived the street-level traffickers' business. There are three relevant agreements in play here. The first is between the individual buyers of sex and the street-level traffickers; the second is between the street-level traffickers and Backpage; and the third is between Backpage and Salesforce. *See* Doc. 1-5, Pet., ¶ 100. Plaintiffs essentially claim that because the money exchanged pursuant to the first agreement—which undeniably constitutes "proceeds of prostitution"—was ultimately paid to Salesforce pursuant to the third agreement, Salesforce agreed to participate in the proceeds of the first agreement. *See* Doc. 25, Resp., 30. This is a step too far. Only the first transaction described above—i.e., between the individual buyers of sex and the street-level traffickers—constitutes "prostitution" within the meaning of the statute.[3] *See* TEX. PENAL CODE § 43.02(a). But there is nothing in the pleadings to suggest the street-level traffickers entered into any agreement—formal or otherwise—with Salesforce, let alone one in which they agreed to share with Salesforce the money derived from their prostitution transactions. Instead, it appears that after the street-level traffickers sold their victims for sex, the street-level traffickers alone had the right to the proceeds

---

[3] Advertising another for sex on Backpage is plainly "offer[ing] . . to receive a fee from another to engage in sexual conduct" and thus constitutes "prostitution." TEX. PENAL CODE § 43.02(a). As such, the money the street-level trafficker derived from placing those advertisements are "the proceeds of prostitution." *Id.* § 43.031(a)(1).

from those sales. To be sure, Plaintiffs allege that the street-level traffickers elected to use these proceeds to purchase advertisements from Backpage, who in turn used that money to purchase technology from Salesforce. *See* Doc. 1-5, Pet., ¶ 100. But on the facts alleged here, the connection between Salesforce and the underlying prostitution transactions is simply too attenuated to permit the plausible inference that Salesforce was a party to an agreement with the street-level traffickers to share in the proceeds of the street-level trafficker's prostitution.

Accordingly, the Court concludes that Plaintiffs failed to plead that Salesforce engaged in promotion of prostitution through its contract with Backpage.

2.      Online Promotion of Promotion

Plaintiffs also failed to allege that Salesforce engaged in the "online promotion of prostitution." The term "online promotion of prostitution" in § 98A.002(a)(2) means "conduct that constitutes an offense under Section 43.031, Penal Code." Tex. Civ. Prac. & Rem. Code § 98A.001(4-a). Section 43.031 of the Texas Penal Code, in turn, provides that a person commits the offense of online promotion of prostitution if he "owns, manages, or operates an interactive computer service or information content provider, or operates as an information content provider, with the intent to promote the prostitution of another person or facilitate another person to engage in prostitution or solicitation of prostitution." Tex. Penal Code § 43.031(a). Plaintiffs do not aver that Salesforce acted with the intent to "facilitate another person to engage in prostitution or solicitation of prostitution." *Id.*; *see* Doc. 1-5, Pet., ¶ 140. Instead, they claim that Salesforce violated § 43.031(a) by "knowingly manag[ing], support[ing], and service[ing] the Backpage account with the intent to promote prostitution, which was widely publicized and known to Salesforce." Doc. 1-5, Pet., ¶ 140. The Court is not persuaded.

Plaintiffs run into an immediate problem in that it is unclear that "the Backpage account" constitutes an "interactive computer service" or "information content provider." Section 43.01 defines "interactive computer service" as "any information service, system, or access software provider that provides or enables computer access to a computer server by multiple users, including a service or system that provides access to the Internet or a system operated or service offered by a library or educational institution." TEX. PENAL CODE § 43.01(1-c). Section 43.01's definition of "interactive computer service" is almost identical to the definition of the same term in § 230 of the Communications Decency Act. 47 U.S.C. § 230(f)(2) ("The term 'interactive computer service' means any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions."). While not addressed at length in this Order, Plaintiffs argued in their papers that Salesforce was not entitled to § 230 immunity, in part because "Plaintiffs' allegations do not establish that Salesforce is an *interactive computer service*." Doc. 25, Resp., 13. Similarly, § 43.01 defines "information content provider" as "any person or entity that is wholly or partly responsible for the creation or development of information provided through the Internet or any other interactive computer service." TEX. PENAL CODE § 43.01 (1-d); *see also* 47 U.S.C. § 230(f)(3). But Plaintiffs argued in connection with their § 230 arguments that "Salesforce's software took no action with respect to any 'content.'" Doc. 25, Resp., 13. The Court is weary to find that "the Backpage account" is either an "interactive computer service" or an "information content provider" in light of Plaintiffs' arguments to the contrary.

But even if the Court were to assume that Salesforce managed an interactive computer service or an information content provider, there are no allegations suggesting that it did so "with

the intent to promote the prostitution of another." TEX. PENAL CODE § 43.031(a). "A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result." *Id.* § 6.03(a). As previously explained, the offense of promotion of prostitution includes the knowing receipt of money pursuant to an agreement to participate in the proceeds of prostitution. *Id.* § 43.03(a)(1). In addition, promotion of prostitution prohibits the knowing "solicit[ation] [of] another to engage in sexual conduct with another person for compensation." *Id.* § 43.03(a)(2).

Based on the foregoing, it appears that, to establish that Salesforce acted "with the intent to promote the prostitution of another," Plaintiffs must allege facts which plausibly demonstrate that it was Salesforce's "conscious objective" to either (a) receive money pursuant to an agreement to share in the proceeds of another's prostitution; or (b) solicit a person to have sex with another for money. *Id.* §§ 6.03, 43.03(a)(1)–(2). They have not done so.

First, as explained, the pleadings do not plausibly demonstrate that Salesforce ever entered into an agreement to participate in the proceeds of the prostitution for purposes of § 43.03.[4] If the allegations are not sufficient to show that Salesforce entered into "an agreement to participate in the proceeds of prostitution" in the first place, it is not plausible that Salesforce's conscious objective was to "receive[] money . . . pursuant to an agreement to participate in the proceeds of prostitution." *Id.* § 43.03(a)(2). Second, there is nothing in the pleadings suggesting that Salesforce intended to engage in the promotion of prostitution by "solicit[ing] another person to engage in sexual conduct for compensation." *Id.* § 43.03(a)(2). To be sure, Plaintiffs allege that the sex traffickers that used Backpage—and perhaps Backpage itself—used Backpage's website with the

---

[4] *See supra* III.B.1

intent to solicit consumers to pay money in exchange for sex. However, while the pleadings might support the inference that Salesforce intended to *facilitate Backpage's* promotion of prostitution, there has been no showing that Salesforce intended to do so *itself*. *See, e.g.*, Doc. 1-5, Pet., ¶ 112 ("Salesforce affirmatively, actively, and continuously aided, encouraged, and contributed to the success of the Backpage.com trafficking venture, *knowing that its software and support facilitated trafficking on Backpage.*" (emphasis added)). The plain language of § 43.031(a) indicates that acting with the intent to facilitate another's promotion of prostitution is insufficient. *See* TEX. PENAL CODE § 43.031(a). Accordingly, the Court concludes that Plaintiffs failed to plausibly plead that Salesforce acted with the intent to promote prostitution.

For these reasons, Plaintiffs have failed to plausible plead that Salesforce engaged in the online promotion of prostitution.

### 3. Aggravated Promotion of Prostitution

Plaintiffs also failed to allege that Salesforce engaged in aggravated promotion of prostitution. The term "aggravated promotion of prostitution" in § 98A.002(a)(2) means "conduct that constitutes an offense under Section 43.04, Penal Code." TEX. CIV. PRAC. & REM. CODE § 98A.001(2). Section 43.04 of the Texas Penal Code, in turn, provides that a person commits the offense of aggravated promotion of prostitution if he "knowingly owns, invests in, finances, controls, supervises, or manages a prostitution enterprise that uses two or more prostitutes." TEX. PENAL CODE § 43.04(a). Plaintiffs here allege that Salesforce engaged in aggravated promotion of prostitution because it "owned Backpage's [CRM] platform, retained ultimate control of and managed the platform used to promote the prostitution of two or more." Doc. 1-5, Pet. ¶ 142.

The problem is that Backpage's CRM platform does not constitute a "prostitution enterprise." TEX. PENAL CODE § 43.04(a). A "prostitution enterprise" means "a plan or design for

a venture or undertaking in which two or more persons offer to, agree to, or engage in sexual conduct in return for a fee payable to them." *Taylor v. State*, 548 S.W.2d 723, 723 (Tex. Crim. App. 1977). Even if the CRM platform could be characterized as a separate venture or undertaking, it did not involve two or more persons offering, agreeing, or engaging in sexual conduct for money. *See id*. It instead collected customer data to help Backpage to sell advertisements more effectively. *See, e.g.*, Doc. 1-5, Pet., ¶¶ 79, 131. Accordingly, Plaintiffs have not shown that Salesforce owned, managed, or was otherwise involved with a "prostitution enterprise." TEX. PENAL CODE § 43.04(a); *See Taylor*, 548 S.W.2d at 723. As such, there are no allegations demonstrating that Salesforce committed aggravate promotion of prostitution.

### 4.    Aggravated Online Promotion of Prostitution

Finally, Plaintiffs failed to allege that Salesforce engaged in the "aggravated online promotion of prostitution." The term "aggravated online promotion of prostitution" in § 98A.002(a)(2) means "conduct that constitutes an offense under Section 43.041, Penal Code." TEX. CIV. PRAC. & REM. CODE § 98A.001(1-a). The offense of aggravated online promotion of prostitution, as defined in Section 43.041 of the Texas Penal Code, is identical to the offense of online promotion of prostitution, *see id*. § 43.031(a), except the former requires that the defendant act with the requisite intent with respect to "five or more persons." *Id*. § 43.041(a). That is, to be convicted of aggravated online promotion of prostitution, a defendant must act "with the intent to promote the prostitution of five or more persons or facilitate five or more persons to engage in prostitution or solicitation of prostitution." *Id*. It thus appears that a person cannot have committed aggravated online promotion of prostitution unless he also commits online promotion of prostitution. *Compare id*. § 43.031(a), *with id*. § 43.041(a). Given that the Court has already

concluded that the pleadings are insufficient to establish online promotion of prostitution,[5] it necessarily follows that they are also insufficient to establish aggravated promotion of prostitution.

\*\*\*

In sum, the Court concludes that Plaintiffs failed to state a claim under Chapter 98A. To survive a Rule 12(b)(6) motion on their § 98A.002(a)(2) claims, Plaintiffs needed to plead facts demonstrating that Salesforce engaged in either promotion of prostitution, online promotion of prostitution, aggravated promotion of prostitution, or online aggravated promotion of prostitution. The pleadings contain no factual allegations which suggest that Salesforce engaged in any of these acts. Accordingly, the Court **GRANTS** Salesforce's Motion with respect to Plaintiffs' Chapter 98A claim. And given the nature of Plaintiffs' allegations in support of their § 98A.002(a)(2) claims, the Court is of the opinion that any amendment to the Petition would be futile. *See Stripling v. Jordan Prod. Co., LLC*, 234 F.3d 863, 872–73 (5th Cir. 2000) ("It is within the district court's discretion to deny a motion to amend if it is futile."). The sole theory advanced by Plaintiffs to show Salesforce committed promotion of prostitution—that sex traffickers used the proceeds of prostitution to pay Backpage who in turn used that money to pay Salesforce—is insufficient as a matter of law. And precisely because Plaintiffs cannot show that Salesforce committed promotion of prostitution by agreeing to participate in the proceeds of prostitution, they similarly cannot show that Salesforce acted with the intent needed to sustain a finding that Salesforce committed online promotion of prostitution or aggravated online promotion of prostitution. Finally, Plaintiffs have not alleged any facts suggesting that they could possibly establish that Salesforce owned, invested in, financed, controlled, supervised, or managed any prostitution enterprise—as such, Plaintiffs

---

[5] *See supra* III.B.2.

also cannot show Salesforce committed aggravated promotion of prostitution. For these reasons, the Court **DISMISSES WITH PREJUDICE** Plaintiffs' § 98A.002(a) claims against Salesforce.

## IV.

## CONCLUSION

For these reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Salesforce's Motion. The Court **GRANTS** Salesforce's Motion with respect to Plaintiffs' Chapter 98A claims. Plaintiffs' § 98A.002(a) claims against Salesforce are **DISMISSED WITH PREJUDICE**. The Court **DENIES** Salesforce's Motion with respect to Plaintiffs' Chapter 98 claims. Should Plaintiffs elect to file an amended complaint, they must do so within **twenty-one (21)** days of this Order.

**SO ORDERED.**

**SIGNED: September 3, 2024.**

JANE J. BOYLE
UNITED STATES DISTRICT JUDGE

-29-