IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| A.S., an individual, | CIVIL ACTION NO. 3:23-CV-1039-B |
| Plaintiff, | Consolidated with: |
| v. | CIVIL ACTION NO. 3:23-CV-1040-B |
| SALESFORCE, INC., BACKPAGE.COM, LLC, AND CARL FERRER, | CIVIL ACTION NO. 3:23-CV-1042-B<br>CIVIL ACTION NO. 3:23-CV-1044-B<br>CIVIL ACTION NO. 3:23-CV-1045-B<br>CIVIL ACTION NO. 3:23-CV-1046-B<br>CIVIL ACTION NO. 3:23-CV-1047-B<br>CIVIL ACTION NO. 3:23-CV-1048-B<br>CIVIL ACTION NO. 3:23-CV-1049-B |
| Defendants. | CIVIL ACTION NO. 3:23-CV-1050-B<br>CIVIL ACTION NO. 3:23-CV-1051-B<br>CIVIL ACTION NO. 3:23-CV-1052-B<br>CIVIL ACTION NO. 3:23-CV-1056-B<br>CIVIL ACTION NO. 3:23-CV-1057-B<br>CIVIL ACTION NO. 3:23-CV-1058-B<br>CIVIL ACTION NO. 3:23-CV-1059-B<br>CIVIL ACTION NO. 3:23-CV-1071-B<br>CIVIL ACTION NO. 3:23-CV-1110-B<br>CIVIL ACTION NO. 3:23-CV-1122-B<br>CIVIL ACTION NO. 3:23-CV-1352-B<br>CIVIL ACTION NO. 3:23-CV-1353-B |

**MEMORANDUM OF DEFENDANT SALESFORCE.COM, INC.
IN SUPPORT OF CONSOLIDATED MOTION TO DISMISS
UNDER RULE 12(b)(6)**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................... 4

LEGAL STANDARD ........................................................................................................... 7

ARGUMENT ........................................................................................................................ 7

     I.     Plaintiffs Have Not Cured the Defects in Their Chapter 98 Claim .......................... 7

     II.     Chapter 98 Does Not Apply to Extraterritorial Conduct ........................................... 9

     III.     Plaintiffs' Federal Trafficking Claim Against Salesforce Should be
              Dismissed ................................................................................................................ 14

            A.     The Court did not grant Plaintiffs leave to allege a new claim .................... 14

            B.     Plaintiffs fail to allege that Salesforce had constructive knowledge
                  that Plaintiffs' advertisements violated section 1591 ................................... 15

            C.     Plaintiffs fail to allege Backpage's section 1591 violations as to each
                  Plaintiff ........................................................................................................ 20

            D.     Plaintiffs fail to allege that Salesforce knew or should have known of
                  Backpage's alleged violation of 18 U.S.C. 1591 ........................................ 25

     IV.     Plaintiff C.R.M.'s Complaint Should Be Dismissed for Non-Prosecution ............. 26

CONCLUSION ................................................................................................................... 27

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.B. v. Hilton Worldwide Holdings Inc.*,
   484 F. Supp. 3d 921 (D. Or. 2020) ...................................................21

*A.B. v. Wyndham Hotels & Resorts, Inc.*,
   532 F. Supp. 3d 1018 (D. Or. 2021) ...............................................3, 17

*Abnet v. Coca-Cola Co.*,
   786 F. Supp. 2d 1341 (W.D. Mich. 2011) ...........................................27

*Armstrong v. Ashley*,
   60 F.4th 262 (5th Cir. 2023) ...........................................................23

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)....................................................................7, 22

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)........................................................................7

*Blackburn v. City of Marshall*,
   42 F.3d 925 (5th Cir. 1995) ..............................................................7

*Bustos v. United Parcel Serv., Inc.*,
   2020 WL 2529384 (S.D. Tex. Apr. 29, 2020) ........................................5

*C.S. v. Wyndham Hotels & Resorts, Inc.*,
   538 F. Supp. 3d 1284 (M.D. Fla. 2021)...............................................20

*Coca-Cola v. Harmar Bottling Co.*,
   218 S.W.3d 671 (Tex. 2006)............................................................11

*Doe #9 v. Wyndham Hotels & Resorts, Inc.*,
   2021 WL 1186333 (S.D. Tex. Mar. 30, 2021)........................................22

*Doe #1 v. Red Roof Inns, Inc.*,
   21 F.4th 714 (11th Cir. 2021) ..........................................................22

*Doe 1 v. Red Roof Inns, Inc.*,
   2020 WL 1872335 (N.D. Ga. Apr. 13, 2020) ........................................21

MEMORANDUM OF LAW IN SUPPORT OF CONSOLIDATED MOTION TO DISMISS

**TABLE OF AUTHORITIES**
(*continued*)

Page(s)

*Doe (K.E.C.) v. G6 Hosp., LLC*,
    750 F. Supp. 3d 719 (E.D. Tex. 2024) ..................................................................................19

*Doe (L.M.) v. 42 Hotel Raleigh LLC*,
    2024 WL 631482 (E.D.N.C. Feb. 13, 2024) ...................................................17, 22, 24, 26

*Doe (S.M.A.) v. Salesforce, Inc.*,
    2025 WL 888433 (N.D. Tex. Mar. 21, 2025) .............................................................1, 3, 8, 16

*Funk v. Stryker Corp.*,
    631 F.3d 777 (5th Cir. 2011) ..............................................................................................5

*J.C. v. Choice Hotels Int'l, Inc.*,
    2020 WL 6318707 (N.D. Ga. 2022) ....................................................................................19

*J.G. v. Northbrook Indus., Inc.*,
    619 F. Supp. 3d 1228 (N.D. Cal. Oct. 28, 2020) ................................................................20

*Johnson v. Bowe*,
    856 F. App'x 487 (5th Cir. 2021) .........................................................................................5

*JSW Steel (USA) Inc. v. Nucor Corp.*,
    586 F. Supp. 3d 585 (S.D. Tex. 2022) ................................................................................22

*Kiobel v. Royal Dutch Petro. Co.*,
    569 U.S. 103 (2013) ...........................................................................................................14

*M.H. on behalf of C.H. v. Omegle.com LLC*,
    122 F.4th 1266 (11th Cir. 2024) .........................................................................................24

*Marmon v. Mustang Aviation, Inc.*,
    430 S.W.2d 182 (Tex. 1968) ...............................................................................................11

*Mayeaux v. La. Health Serv. & Indem. Co.*,
    376 F.3d 420 (5th Cir. 2004) ..............................................................................................15

*N. Cypress Med. Ctr. Operating Co. v. Aetna Life Ins. Co.*,
    898 F.3d 461 (5th Cir. 2018) ..............................................................................................15

*Pohl v. Cheatham*,
    2025 WL 1349691 (Tex. May 9, 2025)
    ...................................................................................................1, 2, 9, 10, 11, 12, 13

*Ricchio v. McLean*,
    853 F.3d 553 (1st Cir. 2017) ..............................................................................................20

**TABLE OF AUTHORITIES**
(*continued*)

Page(s)

*S.M.A. v. Salesforce, Inc.*
   2024 WL 1337370 (N.D. Tex. Mar. 28, 2024) ..................................................3, 16, 18, 21, 26

*Spinosa v. Foremost Insurance Co.*,
   2025 WL 304530 (5th Cir. Jan. 27, 2025) ...........................................................................18

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)...........................................................................................................7

*Temple v. McCall*,
   720 F.3d 301 (5th Cir. 2013) ...........................................................................................10

*United States v. Garcia-Gonzalez*,
   714 F.3d 306 (5th Cir. 2013) ...........................................................................................22

*Walker v. Beaumont Indep. Sch. Dist.*,
   938 F.3d 724 (5th Cir. 2019) .............................................................................................7

**Statutes**

18 U.S.C. § 1591 ...................................................................................3, 16, 18, 20, 21, 22, 23, 25

18 U.S.C. § 1595 .................................................................................1, 2, 8, 20, 21, 22, 23, 24

Tex. Civ. Prac. & Rem. Code § 98 ......................................................................................9, 12, 13

Tex. Penal Code § 20A .................................................................................................................9

Texas Penal Code § 1.04................................................................................................................2, 12

# INTRODUCTION

Plaintiffs' amended complaint asserts two claims against Salesforce: their previously alleged claim under Texas law, Tex. Civ. Prac. & Rem. Code Chapter 98, and a new claim under the federal civil sex trafficking statute, 18 U.S.C. § 1595. The amended complaint should be dismissed with prejudice on the following grounds:

**First**, this Court already dismissed Plaintiffs' Chapter 98 claims for failure to allege facts sufficient to establish that Salesforce had actual knowledge of their trafficking, as necessary to state a claim under Section 98.002(A), and nothing in the amended complaint cures this defect. Plaintiffs still fail to allege that Salesforce knew *both* that Backpage trafficked each of the Plaintiffs as defined by Chapter 20A *and* that each Plaintiff was forced, coerced, or defrauded into prostitution. Dkt. 107 at 12–16. There are no facts showing that Backpage "transported, recruited, obtained" any of the Plaintiffs, and as this Court previously held, Chapter 20A's "trafficking" definition does not include "advertising" under Texas law—so Salesforce necessarily could not have had actual knowledge that Plaintiffs were trafficked by Backpage (nor do Plaintiffs try to allege as much). Nor are there facts showing Salesforce was aware that any individual Plaintiff was caused to engage in commercial sex by force, coercion, or fraud. Given Plaintiffs' failure to cure these pleading defects, the Court should dismiss their Chapter 98 claim with prejudice, as the Court did with respect to the essentially identical Chapter 98 claims against Salesforce in the *S.M.A.* case, *see Doe (S.M.A.) v. Salesforce, Inc.*, 2025 WL 888433 (N.D. Tex. Mar. 21, 2025).

**Second**, apart from the failure of any Plaintiff to state a substantive claim under Chapter 98, nineteen Plaintiffs' Chapter 98 claims assert an impermissible extraterritorial application of Texas law to out-of-state conduct—namely, alleged trafficking of these out-of-state Plaintiffs in states other than Texas. This Court's prior ruling on extraterritoriality, Dkt. 35 at 7–13, was entered before the Texas Supreme Court's ruling in *Pohl v. Cheatham*, ___ S.W.3d ___, 2025 WL 1349691 (Tex. May

1

9, 2025), which materially changed Texas law on extraterritoriality by making clear that (1) a legislative intent to apply a Texas civil law extraterritorially must appear on the face of the statute and cannot be inferred from history or external factors; and (2) the fact that a civil remedies statute (such as Chapter 98) incorporates criminal provisions (such as Penal Code Section 20A) does not indicate an intent that the civil statute apply extraterritorially, even though the Texas Penal Code, through Penal Code § 1.04, generally extends Texas criminal law to out-of-state activity where "either the conduct or a result that is an element of the offense occurs inside this state." *Pohl* 2025 WL 1349691, at *7–9 (quoting Tex. Penal Code § 1.04(a)(1)).    These two holdings squarely reject the extraterritoriality analysis that Plaintiffs presented to this Court, and with which the Court agreed, at the motion to dismiss stage.  For this reason as well, the Chapter 98 claims asserted by the nineteen out-of-state Plaintiffs fail as a matter of law.

*Third,* Plaintiffs' new claims under the federal civil sex trafficking statute, 18 U.S.C. § 1595, should also be dismissed with prejudice.  As a threshold matter, Plaintiffs' addition of these claims was improper as it went beyond this Court's limited order granting Plaintiffs "leave to amend their Chapter 98 claim"—not to add new claims. Dkt. 107 at 4.  Before the Court issued that limited order, Plaintiffs had multiple opportunities to seek to add other claims, including when they filed these cases in Texas state court, when Salesforce removed them to this Court, when this Court denied Plaintiffs' remand motion, and when Salesforce filed its initial motion to dismiss.  Even in their opposition to Salesforce's Rule 12(c) motion, Plaintiffs did not seek leave to add a new federal claim, asking only that they be allowed to add more detail to their Texas-law claim if the Court were to grant Salesforce's motion, *see* Dkt. No. 71 at 24–25—which is precisely the relief the Court granted, *see* Dkt. 107 at 4.  Plaintiffs should not be permitted at this late stage to go beyond the Court's limited order allowing amendment of the Texas-law claim to ambush Salesforce with a new federal claim.

Plaintiffs' section 1595 claim also fails on the merits for the same reason as their Chapter 98 claim—there are no factual allegations sufficient to establish scienter. Plaintiffs allege no facts showing that Salesforce knew or should have known (1) that Backpage violated the federal criminal sex trafficking statute, 18 U.S.C. § 1591, as to each Plaintiff by allowing advertisements for them to be posted, and (2) that each Plaintiff was being forced into prostitution by their advertisements, or even (3) about Backpage's predicate violation of section 1591 as to each of them—all of which must be plausibly alleged to establish a section 1595 claim against Salesforce. *S.M.A. v. Salesforce, Inc.*, 2024 WL 1337370, at \*16–18 (N.D. Tex. Mar. 28, 2024). Among other reasons, no Plaintiff includes detailed, personalized factual allegations of the sort that this Court held sufficient in its later *S.M.A.* ruling—namely, in that case, allegations that "a detective investigating human trafficking saw one of S.M.A.'s advertisements and concluded that she was a trafficking victim" because "the advertisements of S.M.A. had obvious indicia of human trafficking," suggesting that "Salesforce should have known S.M.A. was forced to engage in a commercial sex act." *S.M.A.*, 2025 WL 888433, at \*6–7. Nothing of this sort is alleged for any of the Plaintiffs here—all of whom offer only unadorned and conclusory allegations that advertisements posted for them displayed "obvious indicia of sex trafficking" without any reproduced images or even a narrative stating why that was the case.

Plaintiffs also fail to allege facts showing that Salesforce had a duty to monitor advertisements on Backpage's website. Courts have rejected the notion that generalized internet access creates a duty to monitor or imputes knowledge of unlawful conduct that an internet search might uncover. *See A.B. v. Wyndham Hotels & Resorts, Inc*., 532 F. Supp. 3d 1018, 1027 (D. Or. 2021) (TVPRA does not "impose an affirmative duty to police and prevent sex trafficking"). And Plaintiffs also fail to establish that Backpage itself violated section 1591 as to them, as no facts are alleged showing that Backpage had actual knowledge of each of their ads or was aware of their personal circumstances,

including any alleged force, coercion, or fraud.

For these reasons, this Court should dismiss the amended complaint with prejudice.

## BACKGROUND

*Procedural History and Prior Orders.*  Plaintiffs originally filed 21 individual cases in Dallas County, Texas, asserting claims under Texas Civil Practice & Remedies Code Chapters 98 and 98A. Salesforce removed the cases to this Court, which consolidated them as *A.S. v. Salesforce, Inc.*, No. 3:23-CV-01039-B.  Dkt. 11.  The Court granted in part Salesforce's motion to dismiss, dismissing the Chapter 98A claims with prejudice but denying the motion as to the Chapter 98 claims.  Dkt. 35.

After this Court's initial motion-to-dismiss ruling in *S.M.A.*, Salesforce filed a Rule 12(c) motion for judgment on the pleadings on the ground that Plaintiffs failed to alleged facts constituting actual knowledge of trafficking, as required for a beneficiary liability trafficking claim under Chapter 98.  Dkt. 41.  The Court granted the motion and dismissed the Chapter 98 claims, holding that Plaintiffs failed to establish that Salesforce had actual knowledge "both that (1) Plaintiffs were trafficked and (2) that they were forced to engage in certain prohibited conduct, such as prostitution." Dkt. 107 at 16.  As to actual knowledge of trafficking, the Court held that "[n]one of Plaintiffs' allegations" was "sufficient to establish that Salesforce had actual knowledge that the Plaintiffs were trafficked as defined by the Texas Penal Code," because they did not allege that "Salesforce knew that its venture with Backpage ever transported or recruited any of the Plaintiffs" and the Texas Penal Code does not include "advertising" within its "definition of trafficking."  *Id.*

The Court also held that Plaintiffs "failed to allege that Salesforce had actual knowledge that they were forced to engage in prostitution."  Plaintiffs did not allege that Salesforce "saw each of their advertisements," but "even if Salesforce had seen the advertisements," there were "not enough facts for the Court to draw the reasonable inference that Salesforce knew each Plaintiff was forced to engage in prostitution." Dkt. 107 at 16.  The Court noted that Plaintiffs did not allege that "any

Salesforce employees ever said Plaintiffs were likely being forced to engage in prostitution," and they did "not meaningfully argue that Salesforce had actual knowledge of each of their specific trafficking." *Id.* The Court granted Plaintiffs "leave to amend the Chapter 98 claims" but did not authorize the addition of other claims. Dkt. 107 at 4, 19; *cf.* Dkt. 71 at 24–25 (Plaintiffs' request for leave to amend to add "more detailed knowledge allegations" in light of claimed novelty of Salesforce's reading of Chapter 98—not to add new causes of action).

**Summary of New Allegations.** In response to the Court's ruling, Plaintiffs filed a consolidated amended complaint that (1) reasserts Plaintiffs' Chapter 98 claims, Dkt. 110 ¶¶ 393–402; (2) includes a brief section for each Plaintiff that repeats the basic personal details from the prior individual petitions that the Court dismissed and adds generic, identical, and conclusory assertions that each Plaintiff was advertised on Backpage through ads that contained unidentified "signs" and "clear and obvious indicia" of sex trafficking, *id.* ¶¶ 162–384; (3) largely repeats the prior allegations about Salesforce and Backpage, with some more details drawn from their amended complaint in *S.M.A.*, *id.* ¶¶ 7–20, 53–75, 78–161; and (4) adds a new federal cause of action under section 1595, despite the Court's order limiting any amendment to "the Chapter 98 claims," *id.* ¶¶ 388–392.

As against Salesforce, Plaintiffs allege that their advertisements were "publicly posted on [the] Backpage.com" website by their traffickers and thus were "public facing" and "accessible to Salesforce and available for Salesforce's viewing." *E.g.*, Dkt. 110 ¶¶ 167–70. Plaintiffs do not allege any facts to suggest that Salesforce had a duty to review these ads, including a duty to monitor all ads that might be posted on the website of a classified ads site that also happened to be a customer of Salesforce's business software. Obviously, as Plaintiffs have consistently acknowledged, Salesforce's software was used to organize a customer's customer contact information, not to run its website, *see* Dkt. 110 at ¶ 128 (affirmatively alleging that Salesforce "did not host a platform or

otherwise provide internet access or another public forum" to its customers, including Backpage); *see also id.* ¶¶ 13, 120, 127, 135 & 139, and Plaintiffs identify nothing in any contractual document, legal requirement, or other source that obligated Salesforce to monitor ads posted on Backpage's website. Plaintiffs allege generically that Backpage "used the Salesforce tools and technology" to host account information for people that posted the ads, *id.* ¶ 171, but, again, there is no allegation that Salesforce saw any of Plaintiffs' ads, or that it had an obligation to monitor Backpage's website to view them.

Plaintiffs also allege in a sweeping fashion that the signs of prostitution are the same as signs of sex trafficking, Dkt. 110 ¶¶ 88–91, and consistently use these terms interchangeably as though they are the same thing—which they are not.  They allege that "in virtually every ad on Backpage.com," there were "[v]isible tattoos and branding, including crowns, roses," "name[s]," and "dollar signs" that "communicated clearly" that the ad was for "commercial sex [i.e. "prostitution"] and sex trafficking."  *Id.* ¶ 91.  Other alleged signs and signals of "commercial sex and sex trafficking" included "rates for services for the hour" and "half hour," "code words for orgasms," "phrases used to convey offers of sex," and "euphemistic terms common to the online sex world," as well as photographs indicating prostitution and sex trafficking. *Id.* ¶¶ 88–89.  Plaintiffs nowhere explain what in these words or images necessarily indicate force, coercion, or fraud—as required for any sex-trafficking claim—as opposed to invitations to sex for money or, in some cases, other, legal adult services such as massages, escort services, and the like.

As for the allegations about Backpage's knowledge, the amended consolidated complaint suffers from similar defects.  It asserts the same generic, boilerplate allegations about what the ads depicted, but offers no detail to support the conclusion that Backpage itself "knew that actual or threatened force, fraud, or coercion would be used to cause [each Plaintiff] to engage in commercial sex acts."  *E.g.*, Dkt. 110 ¶ 168.  The only theory it offers to fill this gap is a nonspecific allegation

that "many of the people in the advertisements on Backpage were unwilling victims who were caused to engage in commercial sex acts by fraud, force, or coercion," *id*. ¶ 93, but no details are offered specific to any of the Plaintiffs here.  And even the broader allegation rests almost exclusively on the U.S. Senate Report that this Court cited in its ruling in *S.M.A.*,[1] but that Report was focused entirely on Backpage's moderation practices concerning ads in its "adult" section depicting "prostitution and child sex trafficking," *see* Ex. B at 3, 36, and contained no meaningful discussion or analysis of ads or moderation practices involving involuntary prostitution of adults—meaning ads depicting adults who were "being caused to engage in commercial sex by fraud, force, or coercion," Dkt 110. ¶ 93.

## LEGAL STANDARD

Dismissal under Rule 12(b)(6) is proper based on a dispositive issue of law, *Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 734 (5th Cir. 2019), or "if the complaint lacks an allegation regarding a required element necessary to obtain relief." *Blackburn v. City of Marshall*, 42 F.3d 925, 931 (5th Cir. 1995) (citation omitted).  A complaint must include "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  After stripping away "conclusory statements," the Court must decide whether the remaining allegations "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 545, 561.

## ARGUMENT

### I.    Plaintiffs Have Not Cured the Defects in Their Chapter 98 Claim

The Texas trafficking claim alleged in the amended complaint suffers from the same

---

[1] Plaintiffs repeatedly reference and rely on the Senate Report, but do not attach it.  A full copy of the Report is attached as Exhibit B.  In addressing a motion to dismiss, courts may evaluate documents incorporated by reference. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *see Johnson v. Bowe*, 856 F. App'x 487, 491–92 (5th Cir. 2021); *Funk v. Stryker Corp.*, 631 F.3d 777, 780 (5th Cir. 2011); *Bustos v. UPS, Inc.*, 2020 WL 2529384, at *2 (S.D. Tex. Apr. 29, 2020).

fundamental defect as in their initial pleadings: they fail to allege that Salesforce had actual knowledge that any Plaintiff was trafficked in violation of Texas Penal Code Chapter 20A. Plaintiffs have not even tried to address the deficiencies this Court identified. Indeed, the amended complaint is materially identical to the first amended complaint in *S.M.A.* as to the actual knowledge allegations against Salesforce, even though the Court already dismissed the Chapter 98 claims in *S.M.A.* with prejudice *before* Plaintiffs filed their amended complaint here. *See* 2025 WL 888433, at *14.

This Court held that Chapter 98 creates liability under three distinct provisions: direct criminal liability, criminal participant liability, or civil liability. A defendant may be liable if it (1) directly engages in trafficking in violation of Chapter 20A; (2) intentionally or knowingly benefits from participation in a venture that traffics a person in violation of Chapter 20A; or (3) participates in a venture that engages in trafficking without violating Chapter 20A. Dkt. 107 at 8. The Court held that Chapter 98 requires a plaintiff to allege actual knowledge under both the first and second provisions when the claim is based on a Chapter 20A violation, rejecting Plaintiffs' theory that Chapter 98 imposed no scienter requirement beyond a knowing benefit. *Id.* at 12–15. Because Plaintiffs alleged that they were victims of a Chapter 20A violation, forced prostitution, the Court held that Plaintiffs sought to hold Salesforce liable under the second provision, criminal participant liability. *Id.* As a result, they had to allege facts showing that Salesforce had *actual knowledge* (1) that Backpage trafficked Plaintiffs as defined by Chapter 20A of the Texas Penal Code, *and* (2) that Plaintiffs were *forced, coerced, or defrauded* into prostitution, as opposed to knowledge that that someone engaged in prostitution. *Id.* at 16. The amended complaint adds nothing that meets these requirements.

First, Plaintiffs do not and cannot allege that Backpage trafficked them as defined by Chapter 20A of the Texas Penal Code—much less that Salesforce was aware of such trafficking as to each Plaintiff. Chapter 20A defines "traffic" as to "transport, entice, recruit, harbor, provide, or otherwise

8

obtain another person by any means," Dkt. 107 at 16 (citing Tex. Penal Code § 20A.01(4)), and it does not include advertising, *id.* In the prior pleadings, "none of the Plaintiffs' allegations" was "sufficient to establish that Salesforce had actual knowledge that the Plaintiffs were trafficked," as Plaintiff did not allege that "Salesforce knew that its venture with Backpage ever transported or recruited any of the Plaintiffs." *Id.* at 16. Plaintiffs still do not allege such facts.

Plaintiffs also add no facts to their amended pleading to address the problem that Salesforce never saw ads for any Plaintiff, and that, even if it had, "there are not enough facts for the Court to draw the reasonable inference that Salesforce *knew* each Plaintiff was forced to engage in prostitution." Dkt. 107 at 16. The amended complaint, like the prior pleadings, does not "allege that any Salesforce employees ever said that Plaintiffs were likely being forced to engage in prostitution," *id.*, or even that any Plaintiff was engaged in prostitution. Their only theory is the one the Court rejected: that Salesforce's general awareness of Backpage's reputation, combined with alleged access to data and support communications, confers actual knowledge of individualized advertisements showing that each Plaintiff was caused to engage in commercial sex through coercion, fraud, or force. Dkt. 110 ¶¶ 102–104, 118, 135, 139, 142. But that is not the law.

## II.    Chapter 98 Does Not Apply to Extraterritorial Conduct

All but two of the Plaintiffs' Chapter 98 claims against Salesforce fail as a matter of law for the additional reason that they involve out-of-state trafficking and Chapter 98 does not apply to such extraterritorial conduct under a recent Texas Supreme Court ruling issued after this Court's prior ruling on that issue. In *Pohl v. Cheatham*, ___ S.W.3d ___, 2025 WL 1349691 (Tex. May 9, 2025), the Texas Supreme Court expressly rejected the theory of extraterritoriality offered by Plaintiffs' counsel and accepted by this Court in connection with Salesforce's Rule 12(b)(6) motion in this case—namely that, by incorporating a Texas criminal statute (here, Penal Code Chapter 20A), the operative civil cause of action (here, Civil Prac. & Rem. Code Chapter 98) also necessarily

9

incorporated Penal Code § 1.04, which provides for limited extraterritorial application of Texas criminal statutes. 2025 WL 1349691 at * 8–9. Because Texas law on this critical issue has changed, this Court is bound by the Texas Supreme Court's most recent ruling. *See Temple v. McCall*, 720 F.3d 301, 307 (5th Cir. 2013) (federal courts applying state law must follow "the final decisions of that state's highest court").

The Supreme Court's ruling in *Pohl* significantly clarified the scope of the longstanding rule of Texas law that Texas statutes are presumed "not to have extraterritorial effect." *Pohl*, 2025 WL 1349691, at *7. In so doing, the Court expressly disapproved the lower' court's reasoning, on which Plaintiffs relied here, *see* Dkt. 25 at 23, and the same theory that this Court adopted in its prior ruling on this issue, *see* Dkt. 35 at 10–11. In *Pohl*, out-of-state plaintiffs sued two Texas attorneys to void their legal-services contracts under Texas's civil barratry statute because the lawyers directed out-of-state solicitation of plaintiffs. The Texas lawyers argued that the statute did not apply extraterritorially and that the statute's remedies were unavailable to plaintiffs because they alleged conduct in Louisiana and Arkansas. The Texas Supreme Court agreed. *Id.* at *8.

Following U.S. Supreme Court precedent, the Court adopted a two-step test for evaluating extraterritoriality: (1) whether the statutory text "expresses an intent that it apply extraterritorially," *Pohl*, 2025 WL 1349691, at *8, and (2) if not, whether a proposed application of the statute would be "an impermissible extraterritorial application"—an analysis that looks to "the 'focus' of the Legislature's concern underlying the provision at issue" and asks "whether the conduct relevant to that focus occurred within or outside Texas," *id.* at *9. Applying that test, the Court held that the barratry statute did not apply to conduct occurring in other states. *Id.* at *10.

The Court first held that the barratry statute contained "no indication that the Legislature intended it should apply to conduct occurring outside Texas's borders." *Pohl*, 2025 WL 1349691, at

10

*8.  Applying the presumption "that the Legislature chooses a statute's language with care" and "purposefully omitting words not chosen," *id.* (citing *TGS-NOPEC Geo. Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011)), the Court held that the statute's incorporation of a related criminal statute could *not* establish an "extraterritorial hook" because—contrary to the lower court's assumption and the premise of this Court's prior ruling here (Dkt. 35 at 9–11)—the Legislature did not also incorporate Penal Code Section 1.04, the general Texas extraterritoriality provision for criminal statutes, into the civil statute, *id.*  Because the "Legislature took care to incorporate two specific subsections of the Penal Code" but "made no mention of Section 1.04," the Court held that it "must regard this omission as intentional and meaningful."  *Id.*

Second, the Court held that applying the civil barratry statute to plaintiffs' claims would be impermissibly extraterritorial because the alleged conduct related to the "focus" of the statute—the solicitation that procured the legal-services contracts—occurred outside Texas.  *Pohl*, 2025 WL 1349691, at *10.  The Court focused on the "core conduct" that the Legislature sought to address and determined "where *that* conduct occurred."  *Id.* at *9.  Because the focus of the barratry statute is to protect those in need of legal services from unlawful solicitation, and the actual solicitation occurred outside of Texas, the statute could not apply to plaintiffs' claims.  *Id.*

These same rules bar the application of Chapter 98 to trafficking outside Texas.  Like the barratry statute in *Pohl*, Chapter 98 contains no "language that 'can be construed as *expressly* giving [it] extraterritorial effect,'" and such a "clear intent" cannot be inferred "by implication."  *Pohl*, 2025 WL 1349691, at *7 (quoting *Marmon v. Mustang Aviat., Inc.*, 430 S.W.2d 182, 186 (Tex. 1968)); *see also Coca-Cola v. Harmar Bottling Co.,* 218 S.W.3d 671, 682 (Tex. 2006).  Chapter 98's plain text does not "express[] an intent that it apply extraterritorially."  *Pohl*, 2025 WL 1349691 at *8.  It says nothing about trafficking in other states or otherwise indicates an intent to apply extraterritorially—it

11

sets out and defines the prohibited conduct. *See* Tex. Civ. Prac. & Rem. Code §§ 98.001–002. And the "*absence* of language *limiting* the statute's application" is not enough either, as that would "flip the presumption on its head." *Pohl*, 2025 WL 1349691, at *9.

Nor does it matter that Chapter 98 references and incorporates a provision of the Texas Penal Code. Under *Pohl*, the inclusion of Chapter 20A—the Texas criminal trafficking statute—changes nothing. A statute that lacks express language that it applies extraterritorially cannot be saved by incorporating other statutes that also do not by their own terms apply extraterritorially. *Pohl*, 2025 WL 1349691, at *8. Chapter 20A appears only twice in Chapter 98: (1) to define "trafficking of persons," and (2) to clarify that the lack of a conviction under Chapter 20A cannot serve as a defense to liability under Chapter 98. *See* Tex. Civ. Prac. & Rem. Code §§ 98.001–002. Neither of these sections speaks to extraterritoriality. Because the "Legislature took care to incorporate" these two provisions of Chapter 20A, but "made no mention" of Penal Code § 1.04—the general extraterritoriality provision that, as noted above, formed the basis for Plaintiffs' prior arguments and this Court's prior extraterritoriality ruling, *see* Dkt. 25 at 23; Dkt. 35 at 9–11—the Court "must regard this omission as intentional and meaningful." *Pohl*, 2025 WL 1349691, at *8.

That Chapter 98 was intended to address wrongdoing within Texas's borders is also clear from the statutory scheme. In 2019, the Texas Legislature declared human trafficking a public health issue in Texas, observing that "there are more than 300,000 victims of human trafficking in the State of Texas" and that Texas has the second-highest number of trafficking reports in the country. H.R. Con. Res. 35, 86th Leg. Reg. Sess. Given these trafficking issues unique to Texas, the Legislature enacted a comprehensive statutory scheme to protect individuals against, and aiding victims of, human trafficking in the state. *See* 2019 Tex. Gen. Laws 5170; *see, e.g.*, Tex. Gov. Code § 402.035 (establishing human trafficking prevention task force to enhance Texas's efforts to combat trafficking

12

in Texas); Tex. Code Crim. Proc. art. 2.305 (requiring certain law enforcement agencies to report any in-state trafficking case to centralized data collection system). Because Chapter 98 does not "express[] an intent that it apply extraterritorially," it does not pass the first part of the *Pohl* test. *Pohl*, 2025 WL 1349691, at *8.

As to the second part of the test, all of the relevant conduct that is the "focus" of Chapter 98 occurred outside Texas. *Pohl*, 2025 WL 1349691, at *9. The focus of Chapter 98 is to "protect persons from human trafficking and provide adequate remedies to victims of human trafficking." *See* Tex. Civ. Prac. & Rem. Code § 98.006. The "conduct relevant to that focus," is the trafficking of persons. *See Pohl*, 2025 WL 1349691, at *9. And the only trafficking that Plaintiffs specifically allege is the trafficking by their individual traffickers outside Texas. As for Backpage, as noted, Plaintiffs do not allege that Backpage transported, recruited, or enticed them, so no relevant conduct proscribed by Chapter 20A occurred in Texas. *See* Dkt. 107 at 16. Because the out-of-state Plaintiffs allege that they were trafficked entirely outside Texas, applying Chapter 98 to them would be an impermissible extraterritorial application. And even if "*some* or *any* conduct related to the violation" occurred in Texas, that is not enough under *Pohl*, because what matters is that the core conduct underlying the civil claim that the Legislature sought to address through Chapter 98 indisputably occurred outside Texas. *Pohl*, 2025 WL 1349691, at *9 & *10; *see* Dkt. 110 ¶¶ 162, 174, 185, 196, 208, 231, 242, 253, 264, 275, 286, 297, 308, 319, 330, 341, 352, 374 (as noted below, Plaintiff C.R.M. pleads no facts about where she was trafficked).

Finally, *Pohl* rejected another argument on which this Court previously relied—the effect of a liberal construction, broad purpose provision. Dkt. 35 at 11 (citing § 98.006, stating that Chapter 98 is to be "liberally construed and applied to promote its underlying purpose"); *Pohl*, 2025 WL 1349691, at *9. The civil barratry statute in *Pohl* included materially identical language, *see id.* at *6,

13

citing Penal Code § 82.0651(e) ("[t]his section shall be liberally construed and applied to promote its underlying purposes."). Liberal construction just highlights the focus of the statute, but once the focus is determined, a court still must examine whether the conduct relevant to that focus occurred in Texas.

Here, nineteen Plaintiffs, including A.S., allege no trafficking in Texas—they allege only that they were "sold for sex acts by force, fraud, or coercion" by individual traffickers in other states. Dkt. 110 ¶¶ 162, 174, 185, 196, 208, 231, 242, 253, 264, 275, 286, 297, 308, 319, 330, 341, 352, 374. Plaintiffs cannot overcome Texas's strong presumption against extraterritoriality and their attempt to invoke Texas law fails as a matter of law. Because nothing in Chapter 98 suggests that the Texas Legislature intended to extend these statutes extraterritorially, this Court should not adopt a construction "that carries . . . consequences not clearly intended by the political branches." *Kiobel v. Royal Dutch Petro. Co.*, 569 U.S. 108, 116 (2013). The Texas-law claims of all Plaintiffs except T.M. and C.J.M. should be dismissed with prejudice on this basis as well as the ground noted above.

## III.    Plaintiffs' Federal Trafficking Claim Against Salesforce Should be Dismissed

Plaintiffs amended their Complaint to add a new federal claim. This claim should be dismissed for the simple reason that it exceeds the scope of leave the Court granted, and because, even if the Court allows it, it fails to state a claim.

### A.    The Court did not grant Plaintiffs leave to allege a new claim

The Court's prior ruling expressly "grant[ed] Plaintiffs leave to amend their Chapter 98 claim." Dkt. 107 at 4. Nowhere did the Court authorize Plaintiffs to add entirely new causes of action, including a new federal statutory claim. Notably, Plaintiffs did not ask for leave to amend to add any new claims: instead, they asked for leave to amend only "[i]f the Court concludes that Plaintiffs' scienter allegations are inadequate to state a claim under Chapter 98." Dkt. 71 at 24. They reasoned that Salesforce's arguments about the knowledge requirement under Chapter 98 were novel, so if the Court were to agree with those arguments, they should be allowed to add "more detailed knowledge

14

allegations" to "satisfy that standard," meaning the Chapter 98 knowledge standard that the Court then adopted. *Id.* at 24–25. Plaintiffs made no mention of any intent to add new causes of action and, again, this Court granted them leave only "to amend their Chapter 98 claim." Dkt. 107 at 4. Because Plaintiffs neither sought nor obtained leave to add a new cause of action, their attempt to assert one now should be rejected.

Notably, these cases had been pending for nearly two years before Plaintiffs filed their amended complaint, and Plaintiffs had never asserted a claim under section 1595—despite being aware of the federal statute and its potential relevance, including in related litigation in *S.M.A.* and other cases. Plaintiffs had ample opportunity to assert a section 1595 claim from the outset or to request leave to do so when opposing Salesforce's prior motion. They did neither. *Cf. Mayeaux v. La. Health Serv. & Indem. Co.*, 376 F.3d 420, 427 (5th Cir. 2004) (affirming denial of amendment where plaintiffs sought to "reconstruct[] the case anew" after years of litigation and holding that such an alteration, without leave, was improper); *N. Cypress Med. Ctr. Operating Co. v. Aetna Life Ins. Co.*, 898 F.3d 461, 480 (5th Cir. 2018) (new claims would impose undue burdens and delay). For these reasons, the Court should strike Plaintiffs' section 1595 cause of action against Salesforce (Count 1) as unauthorized by the Court's prior ruling.

**B.    Plaintiffs fail to allege that Salesforce had constructive knowledge that Plaintiffs' advertisements violated section 1591**

Even if the Court considers Count 1, the claim fails as a matter of law because it does not allege facts establishing the elements of section 1595. Section 1595 provides that "a victim of a violation of this chapter" may bring a civil action against the perpetrator or "whoever knowingly benefits . . . financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter." 18 U.S.C. § 1595(a). Section 1591, the statute that criminalizes sex trafficking, in turn makes it a crime either

to traffic another person (as defined by the statute) or to benefit from participation in a venture that trafficked another person—in both cases with *actual knowledge* that the trafficked person will be caused to engage in commercial sex through force, coercion, or fraud. 18 U.S.C. § 1591(a)(1) & (2). As this Court recognized in *S.M.A.*, because Plaintiffs do not allege that Salesforce participated in ventures with their alleged individual traffickers, "Plaintiffs must plausibly allege that Salesforce knew or should have known Backpage violated § 1591 with respect to the advertisements of Plaintiffs," a showing that requires them to "connect the facts establishing Backpage's knowledge of Plaintiffs' being sex trafficked through its website to Salesforce." 2024 WL 1337370, at *3. Accordingly, to establish a section 1595 claim against Salesforce, Plaintiffs must plausibly allege that: (1) Salesforce knew or should have known Plaintiffs' advertisements violated section 1591; (2) Salesforce knew or should have known that Backpage violated section 1591 as to each Plaintiff; and (3) Backpage in fact violated section 1591 as to each Plaintiff. *Id.* at *16–17.

Plaintiffs' federal claims fail as a matter of law because they fail to establish these elements, including that Salesforce knew or should have known that Plaintiffs' advertisements violated section 1591—meaning "(1) that each Plaintiff was advertised and (2) that each Plaintiff would be forced to engage in commercial sex acts by illicit means." *S.M.A.*, 2024 WL 1337370, at *16. The Court's later ruling in *S.M.A.* does not help Plaintiffs because they have not alleged anything like the "three sets of facts" that "taken together," despite the case being a "close call," established a section 1595 claim there. *S.M.A.*, 2025 WL 888433, at *6–7. Specifically, no Plaintiff alleges that Salesforce knew she was advertised on Backpage, and no Plaintiff alleges individual details of her ads indicating force, coercion, or fraud—such as with the S.M.A. allegation, found sufficient by this Court, that "a detective investigating human trafficking saw one of S.M.A.'s advertisements and concluded that she was a trafficking victim." *Id.*

16

First, Plaintiffs do not allege that Salesforce knew they were advertised on Backpage, or that Salesforce reviewed, accessed, or stored any advertisement connected to any Plaintiff. Nor do Plaintiffs even offer a theory of how or why Salesforce "should have known" Plaintiffs' circumstances—a phrase that normally requires that the defendant have had some duty or obligation to exercise reasonable diligence. *See* Restatement (Second) of Torts § 12 (Am. L. Inst. 1965). Plaintiffs assert in conclusory fashion that their ads were "accessible to Salesforce" and "linked to data stored within the Salesforce platform." *E.g.*, Dkt. 110 ¶¶ 169–70. But they offer no facts explaining how or why Salesforce should have seen, much less known about, these public-facing advertisements—in other words, why Salesforce "should have known" their contents. The allegation that Backpage was reported to have a generalized sex trafficking problem does not mean that *Salesforce* was obligated to monitor the Backpage.com website. The TVPRA requires that the defendant "should have known" about a sex trafficking violation, not that the defendant "might have been able to guess about sex trafficking." *Doe (L.M.) v. 42 Hotel Raleigh, LLC*, 717 F. Supp. 3d 464, 470 (E.D.N.C 2024). Nor do Plaintiffs identify any Salesforce employee who saw their ads, or any internal document suggesting Salesforce had a duty or practice to monitor ads on Backpage.com.

The mere fact that Plaintiffs' advertisements may have been publicly accessible on Backpage.com at some point in time cannot support an inference that Salesforce "should have known" of their contents—much less that they depicted adult sex trafficking. Constructive knowledge does not arise merely because content is theoretically available online. Courts have rejected the notion that generalized internet access creates a duty to monitor or impute knowledge of unlawful conduct. *See A.B. v. Wyndham Hotels & Resorts, Inc.*, 532 F. Supp. 3d 1018, 1027 (D. Or. 2021) (TVPRA does not "impose an affirmative duty to police and prevent sex trafficking"). If such access were sufficient,

17

every internet user would have a potential duty to know of all illegal conduct posted online—a limitless and untenable proposition.

Second, Plaintiffs do not and cannot show that the ads by which each of them claims to have been trafficked on the Backpage.com website—even if Salesforce had a duty to monitor those ads, which it did not—would have alerted any reasonable observer that the ads depicted adult sex-trafficking, meaning a person being caused, through force, fraud, or coercion, to engage in commercial sex, as opposed to voluntary (albeit illegal) prostitution, which is insufficient to establish a section 1591 violation or to provide notice of one. *S.M.A.*, 2024 WL 1337370, at *17. Plaintiffs provide no individual details of their ads, relying instead on vague, generic descriptors and unsupported assertions that such features were "obvious." Dkt. 110 ¶¶ 88–91. But the rote recitation "apparent signs of sex trafficking" fails Rule 8's pleading requirement. It is, definitionally, a conclusory, generic statement that does nothing to establish Salesforce's constructive knowledge of each Plaintiff's trafficking. *See, e.g.*, *id.* ¶ 169. The Fifth Circuit recently affirmed dismissal of a claim because the plaintiff made "generic, conclusory allegations" and failed to allege *how* the defendant "did not act reasonably," or *how* the "investigation was not thorough." *Spinosa v. Foremost Ins. Co.*, No. 24-30472, 2025 WL 304530, at *1 (5th Cir. Jan. 27, 2025). The same is true here: Plaintiffs cannot meet Rule 8 without concrete facts showing *how* their advertisements conveyed means of force, fraud, or coercion, and how Salesforce had constructive knowledge of those means.

Significantly, Plaintiffs still do not allege that Salesforce ever saw Plaintiffs, who were individual adults at the time of their trafficking, or saw ads relating to them. Instead, its only alleged connection to these Plaintiffs is at least three degrees removed from Salesforce: through publicly available Backpage.com advertisements that, in Plaintiff's own words, depicted run-of-the-mill prostitution. Other courts have held that the term "should have known" implies a duty on the part of

18

the defendant to make an inquiry or find out the facts that the defendant allegedly "should have known." *E.S. v. Best Western Int'l, Inc.*, 510 F. Supp. 3d 420, 428–31 (N.D. Tex. 2021). In *E.S.,* then-Chief Judge Barbara Lynn held that even *actual knowledge* of a particular plaintiff's advertisement does not establish constructive knowledge of trafficking. 510 F. Supp. 3d 420, 431 (N.D. Tex. 2021). Even though the plaintiff alleged that she was ejected from a hotel after staff saw her Backpage.com advertisement, she failed to establish that the hotel "should have known" of her trafficking because it was "*not clear what the advertisement said*" or whether, based on what was in the advertisement, "it would have put the hotel staff on notice that Plaintiff was being sex trafficked at that hotel." *Id.* In other words, even actual knowledge of a plaintiff's Backpage.com advertisement—which Plaintiffs here do not allege—does not establish that a defendant "should have known" of trafficking.

The lack of allegations of about observable signs of trafficking is especially critical because Salesforce had no duty to monitor its clients' websites, so there was no reason why it "should have known" of any Plaintiff's alleged trafficking—any more than would a member of the general public. That is a different framework from premises liability situations such as hotels, where courts have recognized greater duties toward guests and third parties. *A.B. v. Marriott Int'l, Inc.*, 455 F. Supp. 3d 171, 182 (E.D. Pa. 2020). The lack of any duty to monitor separates this case from those in which courts found constructive knowledge of a plaintiff's trafficking. *See, e.g.*, *Doe (K.E.C.) v. G6 Hosp., LLC*, 750 F. Supp. 3d 719, 737 (E.D. Tex. 2024) (inferring constructive knowledge from hotel's mandated reporting requirements); *J.C. v. Choice Hotels Int'l, Inc.*, No. 20-cv-0155, 2020 WL 6318707 (N.D. Cal. Oct. 28, 2020) (same). And even in the hotel cases, courts regularly find no TVPRA liability where there are insufficient allegations of knowledge. *In E.S.*, the court dismissed claims against hotel defendants because there were no allegations that they "monitored criminal

activity at their hotels or that staff at the hotels were regularly reporting suspect activity" to the defendants, even though the plaintiff alleged that hotel staff ejected her from the hotel after they *actually saw* her backpage.com advertisement.  *See E.S.*, 510 F. Supp. 3d at 428–31.

As this Court held in *S.M.A.*, the "should have known" standard under section 1595 requires circumstances that would alert a defendant not only to the existence of advertising, but also to the underlying coercive conduct.  Even in the hotel context, where there is an underlying duty of care, courts hold that this standard requires observable signs of coercion tied to the individual plaintiff, not generalized features like suggestive language.  Plaintiffs have alleged signs visible to hotel staff, including overt violence, physical deterioration, injuries, sleep deprivation, and heavy drug use, as indicators of sex trafficking.  *See Ricchio v. McLean*, 853 F.3d 553, 555 (1st Cir. 2017); *C.S. v. Wyndham Hotels & Resorts, Inc*., 538 F. Supp. 3d 1284, 1297–99 (M.D. Fla. 2021); *J.G. v. Northbrook Indus., Inc.*, 619 F. Supp. 3d 1228, 1238–39 (N.D. Ga. 2022).  Plaintiffs here allege nothing like this.  Instead, they rely on conclusory language with no detail as to any specific Plaintiff—allegations that are categorically insufficient to state a TVPRA claim.

### C.    Plaintiffs fail to allege Backpage's section 1591 violations as to each Plaintiff

The amended complaint describes heinous conduct by Plaintiffs' individual traffickers, but it does not establish that Backpage committed a criminal sex trafficking violation under 18 U.S.C. § 1591 against each Plaintiff, as required for a viable section 1595 claim against Salesforce.  To establish a section 1591 violation, Plaintiffs must plausibly allege that Backpage (1) knowingly (2) advertised each Plaintiff, (3) *knowing* that (4) means of force, fraud, or coercion (5) would be used to cause each Plaintiff to engage in a commercial sex act.  18 U.S.C. § 1591(a)(1) & (2).  The statute requires intent at two points in time: the advertising permitted by Backpage must be knowing *and* it must be done with Backpage's actual knowledge that another person will cause the victim to engage in commercial sex through force, fraud, or coercion.  If there is no showing that Backpage violated

section 1591(a)(1) as to each individual Plaintiff, "then Salesforce did not participate in a venture which violated § 1591 as to Plaintiffs." *S.M.A.*, 2024 WL 1337370, at *18.

In deciding the motion for judgment on the pleadings, the Court noted that Chapter 98 "closely resembles the federal statute," and concluded that Plaintiffs failed to allege actual knowledge as to Salesforce because, even if Salesforce "had seen the advertisements," "there [were] not enough facts for the Court to draw the reasonable inference that Salesforce knew each Plaintiff was forced to engage in prostitution." Dkt. 107 at 14, 16. As an example of what such an allegation would look like, the Court observed that "Plaintiffs do not allege that any Salesforce employees ever said Plaintiffs were likely being forced to engage in prostitution." *Id.* at 16. The same pleading deficiency exists here for Backpage under section 1591.

Section 1591, in the context of adults, criminalizes conduct relating to commercial sex acts only when induced through force, fraud, or coercion—conduct that distinguishes trafficking from ordinary prostitution. Plaintiffs broadly assert that advertisements on Backpage generally contained "signs and signals of commercial sex *and* sex trafficking" that would have been visible to Backpage, *see* Dkt. 110 ¶¶ 87–94, without ever identifying (1) *what* signs and signals were in *their* advertisements such that Backpage violated section 1591 by allowing the ads relating to *them* to be posted or (2) *how* Backpage had actual knowledge that the signs or signals in *their* advertisements indicated sex trafficking—*i.e.*, forced prostitution—as opposed to voluntary prostitution.

Courts have consistently rejected efforts to conflate prostitution with trafficking. *S.M.A.*, 2024 WL 1337370, at *18; *A.B. v. Hilton Worldwide Holdings Inc.*, 484 F. Supp. 3d 921, 940 (D. Or. 2020) (section 1591 targets only prostitution involving minors or induced by force, fraud, or coercion—it "does not address commercial sex generally"); *Doe 1 v. Red Roof Inns, Inc.*, 2020 WL 1872335, at *3 (N.D. Ga. Apr. 13, 2020). Courts likewise decline to infer actual knowledge of trafficking based

21

on vague or coded references to sexual activity. *L.M.*, 717 F. Supp. 3d at 469–70; *Doe #9 v. Wyndham Hotels & Resorts, Inc.*, 2021 WL 1186333, at *2 (S.D. Tex. Mar. 30, 2021).

Plaintiffs' pleading failure is significant: without allegations indicating force, coercion, or fraud, Plaintiffs cannot plausibly allege that Backpage had actual knowledge that Plaintiffs were trafficked, as opposed to possibly having actual knowledge that they engaged in prostitution. Because Plaintiffs were adults when their advertisements were posted on Backpage.com, the separate provision for minor victims is inapplicable, and Plaintiffs must allege facts showing the "means to" element: that Backpage had actual knowledge that *force, fraud, or coercion* would be used to compel them into commercial sex acts when it allowed their advertisements to be posted on Backpage.com. *See U.S. v. Garcia-Gonzalez*, 714 F.3d 306, 313 n.4 (5th Cir. 2013). Although knowledge may be alleged "generally" under Rule 9(b), the rule grants no "license to evade" Rule 8's plausibility standard, even as to knowledge. *Ashcroft v. Iqbal*, 556 U.S. 662, 686–87 (2009). And here, actual knowledge requires plausible allegations of Backpage's "awareness or understanding of a fact or circumstance," in other words, "a state of mind in which a person has no substantial doubt about the existence of a fact." *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714, 723–24 (11th Cir. 2021). But Plaintiffs allege no facts sufficient to establish that Backpage knew, when each Plaintiff's advertisement was posted, that each Plaintiff was being caused to engage in commercial sex by means of force, fraud, or coercion, as opposed to mere knowledge of commercial sex acts, i.e., prostitution.

Where a plaintiff's allegations establish "two possible explanations for a defendant's conduct, only one of which results in liability, a plaintiff cannot offer allegations that are merely consistent with their favored explanation but are also consistent with the alternative explanation . . . something more is needed" to render the culpable inference plausible to state a claim. *JSW Steel (USA) Inc. v. Nucor Corp.*, 586 F. Supp. 3d 585, 595 (S.D. Tex. 2022), *aff'd*, 2025 WL 832801 (5th Cir. Mar. 17,

2025).  Even if the amended complaint can be read to establish that the ads for Plaintiffs suggested prostitution—and no facts are alleged even to support that conclusion as to any Plaintiff—that is insufficient to establish a sex-trafficking claim under section 1591.

The only allegation about Plaintiffs' advertisements is the generic, non-specific recitation as to each Plaintiff that the ads "contained apparent signs of sex trafficking such that Backpage knew that actual or threatened force, fraud, or coercion would be used to cause" Plaintiffs to engage in commercial sex acts.  *E.g.*, Dkt. 110 ¶ 168.  This conclusory language—reciting statutory elements without supporting facts—cannot survive a Rule 12(b)(6) motion.  *See, e.g.*, *Armstrong v. Ashley*, 60 F.4th 262, 269 (5th Cir. 2023) (courts "do not presume true" legal conclusions, "threadbare recitals of the elements," or "naked assertions devoid of further factual enhancement").

Plaintiffs try to bolster their allegations by pointing to general "signs and signals . . . of trafficking" in their ads, but they admit that those signs are the same as for ordinary prostitution.  Dkt. 110 ¶ 88.  For instance, the amended complaint references tattoos, provocative language, and "roses" as a euphemism for dollars.  *See id.* ¶¶ 88–91.  Plaintiffs allege nothing to show that these references mean that Backpage knew that someone would use force, fraud, or coercion as to *each Plaintiff*, as no Plaintiff alleges any of such facts or explains how Backpage's awareness of these prostitution-related references means that it had actual knowledge that any of the Plaintiffs were being trafficking.

Plaintiffs' allegations about the general run of ads on Backpage.com—meaning allegations not specific to any Plaintiff's specific ads—do not cure this pleading failure.  The amended complaint again references what it says are "signs," "signals," and "obvious indications" of trafficking, but the only examples it gives involve language and imagery commonly associated with prostitution generally, not forced prostitution.  *See* Dkt. 110 ¶¶ 88–94.  This includes references to "GFE," "roses," and sexually suggestive language—all of which are fully consistent with consensual prostitution.  In

sum, nothing in the amended complaint establishes that Backpage had *actual knowledge* that Plaintiffs would be compelled into commercial sex acts through force, fraud, or coercion, as required for a section 1591 violation.

Plaintiffs also do not plausibly allege that Backpage violated section 1591 each time it moderated or edited an advertisement (and they do not allege that Backpage edited or reviewed the advertisements concerning Plaintiffs specifically prior to posting). Although the Senate Report describes Backpage's practice of removing or altering language, that practice was focused on language that indicated illegality—most often, explicit references to sex-for-money transactions— without distinguishing between prostitution and trafficking. The Report does not and cannot establish that Backpage's moderation practices reflected knowledge of trafficking as to any particular individual, much less the Plaintiffs here specifically. Without allegations tying each Plaintiffs' advertisements to Backpage's actual knowledge of trafficking, Plaintiffs fail to state a violation of section 1591—and without that predicate violation, there is no liability under section 1595.

Finally, allegations that Backpage should have known its platform would be misused do not meet section 1591's actual knowledge requirement. The statute is violated only when the defendant had actual knowledge that force, fraud, or coercion would be used to cause a specific victim to engage in a commercial sex act. *See M.H. on behalf of C.H. v. Omegle.com LLC*, 122 F.4th 1266, 1276 (11th Cir. 2024) (allegations about what a defendant *should* have known do not satisfy section 1591's mens rea requirement). Courts also have emphasized that generalized risk awareness, even in the face of known industry problems, does not establish actual or constructive knowledge of a specific trafficking violation. *See L.M.*, 717 F. Supp. 3d at 473 (general allegations of industry-wide trafficking do not establish actual or constructive knowledge of trafficking by force, fraud, or coercion). Plaintiffs must

allege facts showing that Backpage knew that each Plaintiff was being trafficked, not that Backpage *should have known* its website might be used unlawfully.

### D.    Plaintiffs fail to allege that Salesforce knew or should have known of Backpage's alleged violation of 18 U.S.C. 1591

Plaintiffs each allege that "the content of the advertisements selling Jane Doe[s] … for sex contained apparent signs of sex trafficking such that Backpage knew" that force, fraud, or coercion would be used to cause Plaintiffs to engage in commercial sex acts. *E.g.*, Dkt. 110 ¶ 178. Not only is that conclusory assertion insufficient to establish Backpage's section 1591 violations, but Plaintiffs also fail to allege that Salesforce had constructive knowledge of such alleged violations.

Plaintiffs allege that Salesforce maintained a "continuous business relationship" with Backpage from 2013 to 2018. Dkt. 110 ¶¶ 118, 153. Yet the amended complaint contains no allegation that Salesforce was ever aware of, involved in, or given access to Backpage's alleged content moderation practices—or even that it should have known about them. Those practices are precisely what the Senate Report identified as central to Backpage's alleged facilitation of both prostitution and child sex trafficking. But Plaintiffs do not allege that Salesforce's software or employees were in any way involved with Backpage's moderation, accessed ad content, or were aware of ad review. Nor do they cite any internal Salesforce documents indicating awareness of Backpage's moderation practices. And the Senate Report makes no mention of Salesforce at all, despite being the product of a years-long investigation involving more than *one million pages of documents* from Backpage and subpoenaed third parties. *See* App.24.

Plaintiffs do not allege that Salesforce stored, viewed, or transmitted the content of Plaintiffs' Backpage advertisements. Nor do they claim that Salesforce had access to ad metadata or any other data identifying Plaintiffs. For example, they assert that Salesforce may have had access to Backpage's "Org" database, which they allege included customer email addresses. Dkt. 110 ¶¶ 135–

25

140.  But this has no bearing on the actual violation they allege:  that Backpage edited or moderated Plaintiffs' advertisements before allowing them to be posted.  The amended complaint points to email addresses containing terms like "escort" or "XXX," but no such language is connected to *Plaintiffs* in any way—nor does it plausibly establish constructive knowledge of sex trafficking (forced prostitution) as opposed to voluntary prostitution, because, this Court has held, Salesforce was not in a venture with individual traffickers and Plaintiffs were adults at the time of their alleged trafficking. *See S.M.A.*, 2024 WL 1337370, at *3.

In short, Plaintiffs offer no plausible allegation that Salesforce had actual or constructive knowledge of any trafficking of any Plaintiff.  At most, Plaintiffs allege a routine commercial relationship between Salesforce and Backpage.  That is not enough to plead constructive knowledge that Backpage was editing and moderating advertisements in violation of section 1595.  As this Court held in *S.M.A.*, Plaintiffs must "connect the facts establishing Backpage's knowledge of Plaintiffs' being sex trafficked through its website to Salesforce."  2024 WL 1337370, at *18.  They fail to do so because, as discussed above, there are no facts establishing Backpage's actual knowledge of Plaintiffs' alleged sex trafficking, nor is there any alleged reason how Salesforce could have known what Backpage didn't know, or how Salesforce could have independently determined trafficking based on advertisements.  That Backpage could have *guessed* is categorically insufficient to allege constructive knowledge, the required actual knowledge.  *L.M.*, 717 F. Supp. 3d at 470.

## IV.    Plaintiff C.R.M.'s Complaint Should Be Dismissed for Non-Prosecution

Unlike the remaining twenty Plaintiffs, Plaintiff C.R.M. alleges no facts even attempting to support her claims against Salesforce.  Plaintiffs "chose[] to proceed in a normal lawsuit, and must therefore individually satisfy procedural burdens"—meaning that, although they may "jointly make factual allegations against [Salesforce] in a single complaint," that "does not relieve" Plaintiff C.R.M.'s "obligation to provide [Salesforce] with enough information to defend against [her]

claim[]," because "each individual Plaintiff" must allege "how [Salesforce's] behavior gives … her in particular a right to relief." *Abnet v. Coca-Cola Co.*, 786 F. Supp. 2d 1341, 1344 (W.D. Mich. 2011). Plaintiffs seem to recognize this pleading requirement: in a footnote they identify nineteen Plaintiffs who "bring their suits" under sex trafficking laws, and that "any references to Jane Doe (A.S.) apply with equal force" to other Plaintiffs "*with the exception* of the facts section which contains case specific facts for each of the foregoing." Dkt. 110 n.4 (emphasis added). There is no reference to C.R.M. in this footnote, nor does C.R.M. provide any facts specific to her in the facts section. Her claims should be dismissed with prejudice on this basis, in addition to those noted above.

## CONCLUSION

Plaintiffs' claims should be dismissed in their entirety with prejudice.

DATED: June 21, 2025                    Respectfully submitted,

/s/    John T. Cox III
John T. Cox III (Tex. Bar No. 24003722)
Andrew LeGrand (Tex. Bar No. 24070132)
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
Telephone: 214.698.3100
Email: TCox@gibsondunn.com
        ALeGrand@gibsondunn.com

Gregg Costa (Tex. Bar No. 24028160)
 GCosta@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
811 Main St., Suite 3000
Houston, TX 77002
Telephone: 346.718.6649

Kristin A. Linsley
 (*admitted pro hac vice*)
 KLinsley@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP

One Embarcadero Center, Suite 2600
San Francisco, CA 94111
Telephone: 415.393.8395

Attorneys for Defendant Salesforce, Inc.

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true and correct copy of the foregoing Brief in Support of Motion to Dismiss

Pursuant to Rule 12(b)(6) has been served on counsel of record pursuant to the Federal Rules of Civil

Procedure.

*/s/  John T. Cox III*
John T. Cox III

Attorney for Defendant Salesforce, Inc.
