# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| A.S., an individual, | CIVIL ACTION NO. 3:23-CV-1039-B |
| Plaintiff, | |
| v. | Consolidated with: |
| SALESFORCE, INC., BACKPAGE.COM, LLC, AND CARL FERRER, | CIVIL ACTION NO. 3:23-CV-1040-B |
| | CIVIL ACTION NO. 3:23-CV-1042-B |
| | CIVIL ACTION NO. 3:23-CV-1044-B |
| | CIVIL ACTION NO. 3:23-CV-1045-B |
| Defendants. | CIVIL ACTION NO. 3:23-CV-1046-B |
| | CIVIL ACTION NO. 3:23-CV-1047-B |
| | CIVIL ACTION NO. 3:23-CV-1048-B |
| | CIVIL ACTION NO. 3:23-CV-1049-B |
| | CIVIL ACTION NO. 3:23-CV-1051-B |
| | CIVIL ACTION NO. 3:23-CV-1052-B |
| | CIVIL ACTION NO. 3:23-CV-1056-B |
| | CIVIL ACTION NO. 3:23-CV-1057-B |
| | CIVIL ACTION NO. 3:23-CV-1058-B |
| | CIVIL ACTION NO. 3:23-CV-1059-B |
| | CIVIL ACTION NO. 3:23-CV-1071-B |
| | CIVIL ACTION NO. 3:23-CV-1110-B |
| | CIVIL ACTION NO. 3:23-CV-1122-B |
| | CIVIL ACTION NO. 3:23-CV-1352-B |
| | CIVIL ACTION NO. 3:23-CV-1353-B |

## SECOND JOINT REPORT REGARDING MOTION TO COMPEL FURTHER DEPOSITION TESTIMONY FROM THIRD-PARTY WITNESS

Pursuant to the Court's Order on October 2, 2025, Defendant Salesforce, Inc., counsel for third-party witness James Patrick Conner, and Plaintiffs hereby submit this Second Joint Report regarding Salesforce's motion for an order compelling further deposition testimony from third-party witness James Patrick Conner.

## MEET AND CONFER EFFORTS

Pursuant to the Court's October 2, 2025 Order, counsel for Salesforce, Kristin Linsley and Afia Bondero, counsel for Mr. Conner, Gregory Clift, and counsel for Plaintiffs, David Harris and Annie McAdams, all met via videoconference on October 7, 2025.

Counsel conferred about Salesforce's motion to compel further deposition testimony from Mr. Conner (Dkt.151, the "Motion"), with counsel for Salesforce first summarizing for Plaintiffs' counsel what transpired at the previous meet and confer with Mr. Conner's counsel on September 22, 2025. Salesforce's counsel stated that, at the prior conference, Salesforce's counsel detailed Salesforce's position and ran through the categories of at-issue questions, explaining why the answers would not incriminate Mr. Conner. As Salesforce's counsel noted, that conference ended with Mr. Conner's counsel planning to re-review the questions with the witness and update Salesforce on whether there were any questions for which he would withdraw his invocation.

Salesforce's counsel further explained at the October 7 conference why it continued to believe that Mr. Conner had not met his burden to invoke the Fifth Amendment privilege according to the two-step inquiry. Counsel for Salesforce also asked if there was any change in position for Mr. Conner or Plaintiffs as to any category of questions. Counsel for Mr. Conner advised that he had not changed his position on any of the questions. Salesforce's counsel also inquired as to what Plaintiffs' stake in the issue was. Plaintiffs' counsel stated that their interest in the motion and Plaintiffs' position was that they understood Mr. Conner's desire to invoke the privilege and they

1

were not going to force him to waive his constitutional right not to speak. Plaintiff's counsel confirmed that was their position for all of the at-issue questions. Plaintiffs' counsel also noted that they would look to the Court to decide whether Mr. Conner must answer the at-issue questions.

During the conference, the parties were unable to reach an agreement on withdrawing the invocation for any questions or Salesforce withdrawing any questions. The lack of agreement was due to the parties' unchanged positions from their earlier briefing: Salesforce continues to assert that the truthful answers to the questions posed to Mr. Conner would not incriminate him; counsel for Mr. Conner maintains his position that Mr. Conner's invocation of the privilege was proper; and Plaintiffs' position is that they will not make Mr. Conner waive his Fifth Amendment right. The conference lasted for 15 minutes.

## THE PARTIES' POSITIONS

Because counsel for the parties were unable to narrow the disputes over the questions in Appendices A and B to the Motion, all the questions in Appendices A and B remain to be assessed and ruled upon by the Court. Mr. Conner's counsel continues to assert that all of the questions posed could incriminate the witness or provide a link in the chain to incriminate Mr. Conner. Salesforce disagrees and believes that the test is whether truthful answers to the at-issue questions would incriminate Mr. Conner, and because the truthful answers are known from Mr. Conner's previous interviews and are non-incriminating, Mr. Conner has not met his burden to invoke the privilege, and the Court should compel him to respond to the deposition questions. Salesforce further contends that, even apart from the prior interviews, the at-issue questions themselves—on their face and in context—would not meet the applicable test for invoking the Fifth Amendment. Plaintiffs argue that Mr. Conner should not be forced to waive his Fifth Amendment rights.

2

### A.    SALESFORCE'S POSITION

Because Salesforce understands the Court's Order to require the parties to include a "detailed explanation of why agreement could not be reached . . ., including all arguments and authorities on which each party relies," (Order, Dkt. 162 at 4), and the parties did not reach agreement on any of the at-issue questions, Salesforce sets forth its full position below.

Salesforce moved to compel further deposition testimony by Mr. Conner because, under the Supreme Court's test in *Hoffman v. United States*, 341 U.S. 479, 488 (1951), Mr. Conner's "truthful answer[s]" to the questions in Appendices A and B will not incriminate him, an inquiry with which neither Mr. Conner's counsel nor Plaintiffs truly engage. And the witness's truthful answers are known because he responded to the same and similar questions to those in Appendix A in prior interviews with Salesforce's counsel. (*See* Declaration of Kristin Linsley ¶¶ 7-12, Ex. 2.) Salesforce judiciously selected which of plaintiffs' questions to pursue in Appendix B and believes that Mr. Conner's truthful answers to these questions also will not incriminate him. Because the answers to the at-issue questions will not incriminate Mr. Conner, the Court need not reach the question of whether there is a risk of prosecution of Mr. Conner stemming from these answers. Nonetheless, under the relevant analysis, there is no real risk of criminal liability from Mr. Conner answering these questions. To aid the Court in its determination, Salesforce has addressed the categories of questions in Appendices A and B and has also laid out the relevant context and overarching law.

### 1.    <u>Background</u>

Early in these cases, the parties identified third-party witness James Patrick Conner, a former Director of Data at Website Technologies, as a relevant witness. (Declaration of Kristin A. Linsley ("Linsley Decl.") Decl. ¶ 3; *see A.S. v. Salesforce, Inc.*, Case No. 23-CV-1039-B, Dkt. 102 at 6 (N.D. Tex. April 21, 2025) (claiming Salesforce had constructive notice for "many years" that Plaintiffs

3

wanted to depose former Backpage employees, "including Patrick Conner," and actual notice for "at least the past several months").)    Website Technologies was the signatory to the Customer Relationship Management ("CRM") business software subscription agreement with Salesforce that is at issue in these cases and is an affiliate of Backpage.com, LLC.  As part of his responsibilities at Website Technologies, Mr. Conner configured and implemented the Salesforce CRM software, which was Salesforce's standard "Enterprise Edition" of the software used by hundreds of thousands of businesses, government entities, and other organizations to organize their customer data and interactions.  The documents produced in these cases, many of which are reproduced in the Fourth Amended Complaint in *G.G.*, show that Mr. Conner interacted with Salesforce on such issues as the purchase of new software licenses for Website Technologies personnel (each user who has access to the Salesforce system within a customer's organization must have a "license"), additional data storage needs, tech support issues, and similar topics.  (Linsley Decl. ¶ 3.)  As part of preparing its defense in these cases, Salesforce's counsel reached out to Mr. Conner via LinkedIn, and, after some time had passed, he eventually responded and agreed to speak with them.  (*Id.* at ¶¶ 4-5.)

Salesforce's counsel conducted two substantive interviews with Mr. Conner, the first on October 7, 2024, and the second on March 19, 2025.  (*See* Linsley Decl. ¶¶ 6, 8.)  At the outset of the first interview, Mr. Conner volunteered that he finally agreed to speak with Salesforce's counsel because he thought it was unfair that Salesforce was being sued for its relationship with Website Technologies, and he thought the claims asserted against it lacked merit.  (*Id.* at ¶ 6)—a view that he confirmed later in a message to counsel saying that he wanted to be "transparent" with both sides and "confirm the truth." (*Id.*, Ex. 1 (Screenshots of LinkedIn conversation between Salesforce counsel and Mr. Conner) at 3.)

4

Both interviews covered the key sets of allegations that the plaintiffs have asserted in their operative pleadings in these cases, and in both interviews, Mr. Conner addressed and repudiated plaintiffs' key allegations concerning Salesforce's interactions with Website Technologies and Backpage. For example, in the operative pleadings, the plaintiffs allege that Salesforce "built Backpage's platform," and that Backpage "was unable to integrate and migrate its data without Salesforce's assistance." (Linsley Decl. Ex. 4, *A.S. v. Salesforce, Inc., et al.*, Case No. 3:23-CV-01039-B, Dkt. 110, First Amended Complaint ("*A.S.* FAC") (N.D. Tex.) ¶ 129; Linsley Decl. Ex. 5, *S.M.A. v. Salesforce, Inc., et al.*, Case No. 3:23-CV-0915-B, Dkt 51, First Amended Complaint ("*S.M.A.* FAC") (N.D. Tex.) ¶ 105, *see* Linsley Decl. Ex. 6, *A.B. and J.F. v. Salesforce.com, Inc., et al.*, Case No. 4:20-CV-01254, Dkt. 96, Fourth Amended Complaint ("*A.B.* 4AC") (S.D. Tex.) ¶ 75.) And the *G.G.* plaintiff—although she has now removed many of the allegations that were in her operative pleading at the time of the interviews—continues to assert that Salesforce "configured" or "adapted" its software to "each customer's unique needs." (*See, e.g.*, Linsley Decl. Ex. 7, *G.G. v. Salesforce, Inc.*, Case No. 1:20-CV-2335, Dkt. 235, Fourth Amended Complaint ("*G.G.* 4AC") (N.D. Ill.) ¶¶ 91-93.)

During both interviews, Mr. Conner made clear that Salesforce did not in any way customize the software for Website Technologies and that, on the contrary, he had to do any and all of the configuration and implementation of the software himself. At the initial sign up, he noted in the March 2025 interview, Salesforce's attitude was "kind of do what you want with it," with the result that he had to "googl[e] how to do stuff." (Linsley Decl. Ex. 2 (Transcription of March 19, 2025 Recorded Interview with James Patrick Conner) at 3:6-7.) Mr. Conner gave similar statements in the October 2024 interview. (Linsley Decl. ¶ 7.)

Mr. Conner also refuted the plaintiffs' effort to cast the standard technical support package that came with the Enterprise Edition CRM that Website Technologies bought as somehow constituting nefarious "customization" or "manipulat[ion]" to help adapt the CRM software to further Backpage's alleged efforts to create and grow a claimed sex trafficking business (*see, e.g.*, *G.G.* 4AC ¶¶ 120, 123, 132) or as "direct support . . . to draw more sex traffickers into Backpage." (*A.S.* FAC ¶ 401; *see also S.M.A.* FAC ¶ 109 (Salesforce provided "ongoing, personalized operational support" making it possible for Backpage to "engage in . . . sex trafficking, and compelled prostitution").  In his October 2024 interview, Mr. Conner stated without equivocation that plaintiffs' allegations concerning customization were not true.  (Linsley Decl. ¶ 9.)  He also stated in both interviews that, during the period of the Website Technologies subscription, his conversations with Salesforce representatives about the CRM software were largely "transactional," such as "setting things up." (*see* Ex. 2 at 4:7-9).  And although Mr. Conner was occasionally invited by Salesforce sales representatives for drinks or meals, he said they "never actually met in-person"— again contradicting the close and cooperative relationship portrayed in plaintiffs' pleadings.  (*Id.* at 6:17-20, 8:7-15; *see G.G.* 4AC ¶ 156 (citing email between Salesforce representative and Mr. Conner inviting Mr. Conner to lunch or drinks).)

Mr. Conner also discussed how Backpage used the CRM software—and the extent of the CRM software's involvement in Backpage's marketing—in ways that significantly undercut plaintiffs' narrative about Salesforce in these cases.  Plaintiffs allege that Salesforce developed and conducted marketing campaigns for Backpage and/or Website Technologies that were designed to reach street traffickers who might want to place ads on the backpage.com website, and that it also conducted market research and market analytics to help Backpage reach additional criminal perpetrators who might want to post trafficking ads on its website.  (*See A.S.* FAC ¶ 401 (Salesforce

6

"assisted and facilitated Backpage's creation of direct marketing campaigns"), ¶ 392(f) (Salesforce "analyz[ed] information and behavior of pimps and victims to target through direct email campaigns to advertise and promote illegal prostitution"); *S.M.A.* FAC ¶ 162 (Salesforce "facilitated and supported Backpage's analysis of customer and user activity . . . enabling Backpage to more effectively target traffickers and sex buyers"); *A.B.* 4AC ¶ 78 (Salesforce "provided Backpage with capabilities and support for direct marketing campaigns"). The plaintiffs also allege that the Salesforce CRM was used to conduct marketing campaigns and that Salesforce was aware of this use. (*See, e.g.*, *G.G.* 4AC ¶ 161 ("Backpage's use of the Salesforce platform for email marketing is documented throughout the Backpage Org."). And some of the complaints allege that Salesforce itself actually went out and found new "trafficking" customers for the Backpage.com website. (*See, e.g.*, *A.S.* ¶ 401 (alleging "[t]hrough Pardot . . . Salesforce assisted Backpage in creating connections with more sex traffickers, generating a continuous pipeline of sex traffickers direct towards Backpage . . .and encouraging sex traffickers to use Backpage to sell their victims").

Mr. Conner refuted these allegations, stating that Backpage's marketing campaigns were "completely independent of Salesforce entirely." (Ex. 2 at 14:14-15:1.) He explained that Backpage conducted email marketing campaigns through other, non-Salesforce programs, such as MailChimp. (Linsley Decl. ¶ 7.) He also noted that, in any event, the Salesforce CRM program consists of "thousands" of "prebuilt templates" and that a customer would "just click them and then you can edit them yourself." (Ex. 2 at 15:8-13.) This description aligns with examples the *G.G.* plaintiff cites in her Fourth Amended Complaint that show computer coding suggestive of a template (*see G.G.* 4AC ¶¶ 161-165), but in any event, Mr. Conner made clear that the marketing that Backpage conducted was largely done through other programs, not Salesforce. And he further made clear that Salesforce certainly did not itself develop or implement marketing campaigns on Backpage's behalf.

7

(Ex. 2 at 14:14-14:18 (Mr. Conner stating "No" in response to a question regarding plaintiffs' allegations that Salesforce helped Backpage develop and implement marketing campaigns.))

Plaintiffs in these related cases have tried to suggest that interactions between Salesforce and Backpage evince an illegal venture to promote sex trafficking—alleging, for example, that Salesforce "guided Backpage" to "identify individuals who used Backpage.com in the last 90 days" to keep only those users in Backpage's new CRM system, (*G.G.* 4AC ¶¶ 196-197), or that Salesforce "directly assisted Backpage" in "utilizing and weaponizing Salesforce's software" to expand and operate the alleged trafficking venture (*A.S.* FAC ¶ 401; *S.M.A.* FAC ¶ 162). But Mr. Conner flatly refuted the suggestion that Salesforce and Backpage/Website Technologies were somehow working together or that Salesforce was helping Backpage with its business—he made clear that there were not even discussions about what Backpage did, that the relationship was entirely "transactional," and that that the "primary reason for using Salesforce was to keep track of contact information," such as "email, phone number." (Ex. 2 at 16:22-25.)

Mr. Conner's interview also threw cold water on plaintiffs' allegation that Salesforce helped Backpage "migrate" its data overseas allegedly to evade law enforcement. (*See G.G.* 4AC ¶¶ 172-173; *A.S.* FAC ¶¶ 152, 392(j); *A.B.* 4AC ¶¶ 74, 97(k); *S.M.A.* FAC ¶ 128.) Mr. Conner explained that Backpage's "reasons" for trying to separate the European data from the U.S. data "w[as]n't for anything other than simple location" because "if we had them all in one system things would just get crossed . . . [causing] duplication of efforts towards the same advertiser" and Salesforce was used primarily for the United States. (Ex. 2 at 10:10-12:5.)

Finally, plaintiffs allege generally that Salesforce "facilitated the growth of Backpage's business, a business that was largely a sex-trafficking business," (*G.G.* 4AC ¶ 225), and that Salesforce was aware that "Backpage was in the business of selling sex through prostitution and the

8

sex trafficking of minors and adults," (*A.S.* FAC ¶ 121; *see S.M.A.* FAC ¶ 162 (Salesforce knew "Backpage was a sex trafficker and engaged in the promotion of prostitution"). Mr. Conner, again one of the main Backpage/Website Technologies contacts with Salesforce, stated that "at no point did I think we were an adult site," referring to Backpage, and that he felt as though "we actually helped a lot of people, for a number of reasons." (Ex. 2 at 21:21-22, 22:2-3.) He also mentioned that Backpage received a "global award from NCMEC" (the National Center for Missing and Exploited Children) for combating sex trafficking with children and that there was a "plaque on the wall from the FBI for the work [Backpage] d[id] to save children." (*Id.* at 22:2-8.) This is consistent with testimony Mr. Conner provided at his deposition regarding publicly available articles throughout the period of the Website Technologies/Salesforce subscription agreement recognizing the significant contributions Backpage and Website Technologies were making toward combatting sex trafficking, including cooperation with state and federal law enforcement, responding to subpoenas, and reporting of suspected violations. (*See, e.g.*, Linsley Decl. Ex. 3 Transcript of James Patrick Conner Deposition on August 15, 2025 ("Tr.") at 216:12-219:23 (recalling positive press related to Backpage and "working hand in hand with law enforcement").)

During his discussions with Salesforce's counsel, including on March 19, 2025, Mr. Conner stated that he was willing to receive a deposition subpoena and to sit for a deposition. (Linsley Decl. ¶ 13.) As noted above, he told Salesforce's counsel that he was willing to do so because he felt that the lawsuits against Salesforce relating to Backpage were unjust and he wanted to "confirm the truth" regarding Salesforce and Backpage. (Linsley Decl. ¶ 6, Ex. 1 at 3.) After Salesforce notified plaintiffs' counsel about deposing Mr. Conner and plaintiffs' counsel became involved, all of that changed. On March 21, two days after the second Conner interview, Salesforce's counsel advised plaintiffs' counsel that they would be seeking to depose Mr. Conner. On March 23, just two days

9

later, Mr. Conner told Salesforce's counsel via text that he had spoken to plaintiffs' counsel briefly that day and intended to "continue" being "transparent and communicative." (Linsley Decl. Ex. 1 at 4.) At his deposition, Mr. Conner testified that, at some point after his interviews with Salesforce's counsel, he was contacted by Tommy Fibich, one of plaintiffs' counsel in the *G.G.* case. Mr. Conner testified that Mr. Fibich initially contacted Mr. Conner's mother, learned from her that Mr. Conner had recently experienced personal setbacks, and urged her to have Mr. Conner contact him. When Mr. Conner did so, Mr. Fibich told Mr. Conner that he needed "protection" (Tr. at 214:18), that Mr. Fibich thought he should have a lawyer, and that Mr. Fibich would provide him a lawyer at no cost (Tr. at 214:8-215:1).

Mr. Fibich then introduced Mr. Conner to a lawyer and later offered a different lawyer, Gregory Clift, who then represented the witness in connection with his deposition. (Tr. 103:10-104:25.) Following that introduction, on July 11, 2025, Mr. Clift advised counsel for the parties by email that his client would be invoking the Fifth Amendment and declining to answer any substantive questions during the deposition. (Linsley Decl. ¶ 15.) The deposition was then rescheduled for August 15, 2025.

On August 13, 2025, counsel for Salesforce met with Mr. Clift by telephone in an effort to determine whether there were areas of questioning as to which he would not instruct the witness to testify. (Linsley Decl. ¶ 16.) In particular, Salesforce's counsel described the substance of Mr. Conner's previous statements during October 2024 and March 2025 interviews with the witness. (*Id.*) During that call, Mr. Clift asked whether either of the interviews had been recorded. (*Id.*) That evening, the associate who had participated in the March 2025 interview recalled that he had recorded it for note-taking purposes. (Linsley Decl. ¶ 17.) On the following day, Salesforce's counsel was able to have the recording extracted from the associate's iPhone. (*Id.*) Salesforce's

10

counsel promptly notified Mr. Clift about the recording and, in response to his request, produced it to both Mr. Clift and plaintiffs' counsel. (*Id.* at ¶ 18.) Salesforce's counsel also had the interview transcribed, and, also at Mr. Clift's request, provided the transcript to Mr. Clift and plaintiff's counsel. (*Id.*). Salesforce's counsel also offered to postpone the Conner deposition so counsel for the witness and/or plaintiffs' counsel could have a full opportunity to review the recording and the transcript prior to the deposition. (*Id.* at ¶ 19.) Neither the witness's counsel nor plaintiffs' counsel accepted this offer, and the deposition went forward on August 15, 2025. (*Id.*)

At the deposition, Mr. Conner's counsel again advised counsel for both sides that the witness would invoke the Fifth Amendment as a basis for refusing to answer all questions beyond "name, rank, and serial number." (Tr. 8:17-19.) As directed by his counsel, Mr. Conner then invoked the Fifth Amendment in response to the vast majority of substantive questions posed to him, and effectively all questions relating to his interactions with Salesforce.

The substantive questions Mr. Conner refused to answer covered the same subject areas that he had discussed in his prior interviews with Salesforce's counsel, including the business relationship between Salesforce and Website Technologies, the witness's interactions with Salesforce, and information about the technology that Salesforce sold Website Technologies. In particular, Mr. Conner repeatedly refused to answer questions that he had freely answered during the March 19, 2025 conversation with Salesforce, including questions drawn directly from the recorded interview and related transcript.

The only substantive questions to which Mr. Conner did respond to were questions on topics separate from his work at Backpage, such as questions regarding his knowledge of certain industry terms, such as the meaning of "customization" in the context of Customer Relationship Management software (Tr. 40:9-16), or his awareness of public perceptions of and news reports about Backpage

11

(*see, e.g.*, Tr. 216:18-217:2).  And, in line with plaintiffs' offer of free counsel, Mr. Conner testified

that he had not been billed for fees by his attorney.  (Tr. 209:4-5.)

> **2.**      **The Court Should Compel Mr. Conner's Further Deposition Testimony on the Questions in Appendices A and B**

Rule 26(b)(1) of the Federal Rules of Civil Procedure allows discovery regarding "any

nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of

the case."  If a deponent fails to respond to questions during a deposition, including by invoking a

privilege, the witness may be compelled to answer those questions under Rule 37(a)(3)(B)(i).

The Fifth Amendment states that no person "shall be compelled in any Criminal Case to be

a witness against himself."  U.S. Const. Amend. V.  A witness such as Mr. Conner may invoke the

Fifth Amendment as a basis for refusing to respond to questioning only where he establishes two

requirements.  *First*, the testimony he would give must tend to incriminate him in criminal conduct.

*See In re Corrugated Container Anti-Trust Lit.*, 620 F.2d 1086, 1091 (5th Cir. 1980).  If the

"truthful[]" answer to the question would not be incriminating, *In re High Fructose Corn Syrup*

*Antitrust Litig.,* 295 F.3d 651, 663 (7th Cir. 2002), the witness "must answer."  *In re Corrugated*

*Container*, 620 F.2d at 1091; *see also United States v. Zicarelli*, 92 S. Ct. 1670, 1676 (1972) (inquiry

focuses on "what a truthful answer might disclose"); *Hoffman v. United States*, 341 U.S. 479, 488

(1951) (court considers whether a "truthful answer" is incriminating).  This is because the right to

refuse to testify under the Fifth Amendment is "confined to instances where the witness has

reasonable cause to apprehend danger from a direct answer."  *Hoffman*, 341 U.S. at 486.

To sustain the privilege, courts must undertake a context-specific inquiry, considering factors

such as "the implications of the question," "the setting in which it is asked," and "why it cannot be

answered."  *Hoffman*, 341 U.S. at 486-87.  The court also should consult its "personal perception of

the peculiarities of the case as by the facts actually in evidence." *Id.* at 487. Ultimately, the witness "must" offer "some credible reason why a response would pose a real danger of incrimination, not a remote and speculative possibility." *Hillmann v. City of Chicago*, 918 F. Supp. 2d 775, 779 (N.D. Ill. 2013) (citing *Martin-Trigona v. Gouletas*, 634 F.2d 354, 360 (7th Cir. 1980)); *see Shakman v. Democratic Org. of Cook Cnty.*, 920 F. Supp. 2d 881, 888 (N.D. Ill. 2013) ("the person claiming the privilege must establish the possibility of self-incrimination with respect to *each question* and assist the court in its job of weighing the validity of the privilege claim").

*Second*, even if a truthful answer to the questions posed might incriminate the witness, the court still must consider whether the witness faces a real risk of criminal prosecution. *In re Corrugated Container Anti-Trust Lit.*, 620 F.2d at 1091. Here, at both steps of the inquiry, Mr. Conner cannot meet his burden of establishing his right to invoke the privilege because his truthful answers would not incriminate him or create any real risk of criminal prosecution. *See, e.g.*, *United States v. Melchor Moreno*, 536 F.2d 1042, 1049 (5th Cir. 1976).

*Finally*, a witness may not take a "carte blanche" approach for invoking the Fifth Amendment as a basis for refusing to provide testimony. *In re High Fructose Corn Syrup*, 295 F.3d at 663; *see also Coil Tubing Rentals and Supply Co. v. Camco Intern., Inc.*, 1994 WL 25522, at *1 (E.D. La. Jan. 21, 1994) (deponent may not make "blanket" invocation of his Fifth Amendment rights but must justify the defense on a question-by-question basis).

The touchstone for invocation of the Fifth Amendment is whether a "truthful answer" to the question would tend to reveal that the witness participated in criminal activities. *Hoffman*, 341 U.S. at 488. And the Supreme Court made clear in *Hoffman* that evaluating a witness's assertion of the Fifth Amendment privilege is a context-driven inquiry. In *Hoffman*, the Supreme Court considered whether the petitioner properly invoked the Fifth Amendment in response to a series of questions

13

posed during a grand jury session about a fugitive witness that the petitioner knew. *Id.* at 480-81. In upholding the invocation, the Court found that the courts below had improperly limited their inquiry to the bare questions posed to the witness and had improperly disregarded a separate document that he submitted explaining his reasons why questions, although apparently innocuous, would yield answers that would incriminate him. *Id.* at 489. The Court also found it important that the judge who ruled on the petitioner's claim of privilege had himself impaneled the special grand jury before which the petitioner appeared to investigate "rackets" in the district. *Id.* at 487, 490. The petitioner had a lengthy, publicized criminal record and was known to be a "gangster" in the area. *Id.* at 489. And the questions posed to the petitioner about the fugitive "all" could "easily have required answers that would force links in a chain of facts imperiling petitioner with conviction of a federal crime." *Id.* at 488.

Here, in contrast, the context shows precisely the opposite. The truthful answers to Salesforce's questions, as evidenced by Mr. Conner's prior statements in the October 2024 and March 2025 interviews, would not incriminate Mr. Conner in any way. None of the questions Salesforce's counsel asked would tend to implicate Mr. Conner in any criminal conduct. There is no criminal investigation into Salesforce and the use of its CRM software by Website Technologies or Backpage. Although Backpage and some of its senior executives have been investigated and criminally prosecuted based on allegations that Backpage, an online classified advertisement service, facilitated prostitution by allowing users to post advertisements for prostitution on its website, *see, e.g.*, *United States v. Lacey*, No. 2:18-CR-00422 (D. Ariz. July 25, 2018), Dkt. 230, Salesforce is not a defendant in those proceedings, and its subscription agreement with, and provision of CRM software to, Website Technologies has nothing do to with the backpage.com website and is not a focus or even a subject of the criminal proceedings.

14

In his statement set out below, Mr. Conner's counsel asserts broadly that, because the witness's role at Website Technologies involved data or IT, *any* question about his role at Backpage/Website Technologies could furnish a link in a chain of evidence for prosecution. But this view is based on a series of factual inaccuracies and legal overreach, and in any event violates the rule that Fifth Amendment invocations asserted in "blanket" form are improper. From a factual standpoint, Mr. Conner's position at Website Technologies was not a general "technology person." He was responsible for organizing Backpage's customer data, meaning contact information, email addresses and the like—not for managing the backpage.com website or creating or implementing the content moderation policies that governed what types of advertisements could be placed on the site. In other words, Mr. Conner had nothing to do with the advertising content moderation policies that were at issue in the Senate Hearing in 2017 and in the criminal proceedings of certain Backpage executives and content moderation managers. Not surprisingly, Mr. Conner was never investigated or called as a witness in any of the Backpage-related criminal proceedings.

Mr. Conner's counsel suggests that Backpage was "deeply involved" in sex trafficking, but as Salesforce notes below, the Department of Justice specifically investigated sex trafficking charges against Backpage and its executives and concluded that the government would not be able to support sex trafficking charges against any of them (*see infra* n. 2)—and, indeed, no such charges were ever brought. As counsel's own exhibit shows, the only charges that were brought were facilitation of prostitution and money laundering (*see* Ex. B at 2), and the five-year statute of limitations on those claims has already run, making prosecution of Mr. Conner on the same charges impossible. More fundamentally, Mr. Conner's counsel does not explain how the witness's actual role, which again did not involve the content moderation policies or operation of Backpage's website that were at issue in the criminal proceedings, could expose him potential criminal liability. On the contrary, Mr.

15

Conner managed the Salesforce CRM software for Website Technologies/Backpage. No criminal investigation or charges have ever been concerned with Backpage's use of the Salesforce CRM business software, with Backpage's relationship with Salesforce, or with any aspect of Backpage's organization of its customer contacts. Any suggestion that these topics would support criminal charges would be pure speculation—which is insufficient to support a refusal to testify under the Fifth Amendment. *Hillmann*, 918 F. Supp. 2d at 779.

Mr. Conner's counsel next suggests that Salesforce witnesses invoked the Fifth Amendment in their depositions, and also points to allegations the Plaintiffs made in their operative complaints implying that Salesforce itself assisted Backpage with criminal behavior. As an initial matter, no Salesforce witness ever invoked the Fifth Amendment in any proceeding related to Backpage, so counsel is simply mistaken on that point. More broadly, as shown in detail above, Plaintiffs' allegations in these civil cases are not what decides whether there is a true threat of incrimination under the applicable Fifth Amendment tests. For one thing, these are civil proceedings, and the Fifth Amendment has nothing to say about the threat of such proceedings. And Plaintiffs' sprawling allegations of wrongdoing by Salesforce are precisely what the witness made crystal clear in his pre-deposition interviews ***were not true***—so, once again, the truthful responses to Salesforce's questions on these subjects not only would not incriminate Mr. Conner, but would defeat Plaintiffs' entire case of alleged wrongdoing/complicity by Salesforce. This is undoubtedly why Plaintiffs do not want Mr. Conner to testify.

Notably, Plaintiffs' expansive allegations confirm why Salesforce's stay motion is irrelevant here. Salesforce sought a stay because Plaintiffs' pleadings try to link Salesforce to an alleged venture to traffic victims and expressly cite and incorporate materials from the Backpage prosecutions. Mr. Conner's truthful responses to Salesforce's questions confirm that it engaged in

none of the conduct that Plaintiffs' pleadings try to cast as "participation" in an illegal venture via Salesforce's innocuous software. In fact, the witness's responses confirm that this was an arms' length business contract and that Salesforce had no involvement in Backpage's operations.

These factual inaccuracies are compounded by improper "blanket" assertions of the Fifth Amendment privilege by Mr. Conner's counsel. *Coil Tubing Rentals and Supply Co.*, 1994 WL 25522, at *1. Rather than addressing the categories of questions, he asserts that *"each"* and every question could be an incriminating link. He also claims that "anything" and "anyone" related to Backpage could be criminally liable. These arguments fall well short of meeting his burden to establish the possibility of self-incrimination with respect to each question. And in this Circuit, "courts cannot accept Fifth Amendment claims at face value" because that "would allow witnesses to assert the privilege where the risk of self-incrimination was remote or even non-existent." *Melchor Moreno*, 536 F.2d at 1046. Courts have made clear that any invocation of the Fifth Amendment must be assessed on a question-by-question basis. *Coil Tubing Rentals and Supply Co.*, 1994 WL 25522, at *1. Although Mr. Conner's counsel contends broadly that Backpage was involved in sex trafficking, he once again points to no authority that a *civil* plaintiff's allegations must be taken as true when conducting the inquiry related to the Fifth Amendment privilege—which is a protection against *criminal* prosecution. For example, he argues that the Seventh Circuit made "findings" that Backpage violated 18 U.S.C. § 1591, but the Seventh Circuit made clear that it was taking the plaintiff's unproven allegations as true, as required on a motion to dismiss. *G.G. v. Salesforce.com, Inc*., 76 F.4th 544 (7th Cir. 2023).

Even beyond the basic background questions, Salesforce's questions focus on Mr. Conner's experience with Salesforce, Salesforce representatives, and Salesforce's CRM business software. And it is undisputed that neither Salesforce nor its software had anything to do with the operation of

17

the backpage.com classified ads website or the content moderation policies used by that website, and that neither Salesforce nor its CRM software was ever the subject of any criminal proceedings. Although counsel and Plaintiffs claims that emails produced in discovery should be sufficient instead of Mr. Conner's actual testimony, Salesforce needs to obtain the testimony to demonstrate that plaintiffs have mischaracterized the emails and to confirm that, contrary to plaintiffs' allegations, Salesforce did not somehow help Backpage traffic plaintiffs by customizing the software Website Technologies used, creating and implementing marketing campaigns for Backpage, or working closely with it to try to grow an illicit business. Salesforce is entitled to seek Mr. Conner's testimony on these matters to disprove plaintiffs' allegations because they do not infringe on Mr. Conner's Fifth Amendment privilege.

Salesforce addresses the categories of questions in Appendix A in turn, grouping them where they raise similar issues to show that Mr. Conner's truthful answers do not incriminate him:

- **Mr. Conner's Employment at Website Technologies and Interviews with Counsel for Salesforce**

These questions touched on basic background, including Mr. Conner's employment at Website Technologies, his job responsibilities, and the contract with Salesforce for CRM software, as well as questions about his belief in the fairness of plaintiffs' allegations against Salesforce based on previous conversations Mr. Conner had with Salesforce's counsel. Mr. Conner already answered most of these questions in previous interviews. And it strains belief that his answer to, for example, the fact that he had a job at Website Technologies that involved data, or his view on whether the pending lawsuits against Salesforce are fair, could incriminate him in any way.

18

- **Website Technologies' Use of Salesforce's Technology to Prevent Fraud and Report Trafficking and Backpage's Business and Assistance to Law Enforcement**

In his previous interviews, Mr. Conner explained that Backpage moved to a new CRM system to cut down on fraud and spam and was able to use it to report relevant information to the National Center for Missing and Exploited Children, or NCMEC (*see* Ex. 2 at 2:8-3:1). He also noted that he thought Backpage was helping a lot of people and there was a plaque on the wall from the FBI regarding the work Website Technologies and Backpage had done to save children, including through law enforcement reporting and cooperation. (Ex. 2 at 22:2-25.) Although some of the at-issue questions, particularly those posed by plaintiffs' counsel (Appendix B), ask about links between Backpage and child trafficking, those questions exemplify why the test looks to what the "truthful answer" would be—not just any hypothetical answer—in considering whether a person would be incriminated. Here, Mr. Conner's truthful answers about his knowledge of Backpage's business would not provide any link in a chain of prosecution evidence because they actually reflect conduct *supportive* of law enforcement. There is no basis to invoke the Fifth Amendment for these categories of questions.

- **Salesforce's Limited Involvement in Implementing Website Technologies' CRM Software; Salesforce's Lack of Customization of its Software for Website Technologies; and Tech Support with Regard to CRM Software Generally does not Include Customization to a Specific Customer**

As Mr. Conner explained in his interviews, Salesforce provided Website Technologies with a standard, out-of-the-box CRM software package and provided no assistance in configuring or implementing it, much less customizing the software for an illegal business. Not only would Mr. Conner's truthful answers to these questions severely undermine Plaintiffs' liability theories against Salesforce, but they would not incriminate Mr. Conner in any way in any criminal charges or investigation. *Hoffman*, 341 U.S. at 486. Certainly, completely innocuous questions such as his

19

use of Google to figure out how to use Salesforce's CRM software would not possibly provide an incriminating link in a criminal chain of evidence.

- **Website Technologies and Salesforce's Relationship and Communications**

Many of the questions in this category are pulled directly from the transcript of the March 2025 interview with Mr. Conner and confirm his previous statements. As he said repeatedly, the relationship between Website Technologies/Backpage and Salesforce and its representatives was "transactional." (*See, e.g.*, Ex. 2 4:1-12.) It was a "strictly business relationship about context." (*Id.* at 2:7-8.) These questions do not invade any potential self-incrimination privilege, because they simply describe the relationship between Salesforce and Website Technologies. And, as noted above, Salesforce is not a defendant in any criminal proceeding related to Backpage nor is its CRM software a subject of any criminal proceeding.

The same is true of questions relating to whether Salesforce worked closely with Backpage on its business plan and/or provided it with general business advice. Mr. Conner confirmed in the interviews that Salesforce did not even know the details of Backpage's business and certainly did not provide business assistance or advice on how Backpage might run its website or its business more generally. (*See, e.g.*, Ex. 2 at 4:3-5 (stating there was "no back and forth developed really, you know, what your company even does, particularly").)

- **Salesforce's Lack of Involvement in Backpage's Marketing Research or Analytics**

In the previous interviews, Mr. Conner made clear that Website Technologies/Backpage did not use the Salesforce CRM software for its marketing, instead using other programs sold by other companies like Mailchimp. The non-use of Salesforce in this marketing area also does not provide an incriminating link to any potential prosecution of Mr. Conner. It is, however, highly relevant to

20

the plaintiffs' false allegations that Salesforce was intimately involved in assisting Backpage with marketing campaigns, market analytics, and website customer campaigns.

- **Salesforce's Inability to Access Backpage Advertisements through its Org and the Types of Data Stored on its Server**

The same analysis applies to truthful answers to questions referencing ads on the backpage.com website, such as whether backpage.com ads were housed or sold on Salesforce's server (Mr. Conner confirmed that they were not), what types of data from Backpage were stored on the Salesforce CRM (as Mr. Conner clearly indicated, this would have been customer contact information), and whether individuals from Salesforce could view or access the content of ads posted on the backpage.com website through the "Backpage Org," the area of the Salesforce server where a specific customer's data is stored (known as an "instance"). It is well known, and Mr. Conner testified in his deposition, that backpage.com was a classified advertising site that hosted ads for a range of products. (*See* Tr. at 17:6-19.) Mr. Conner also testified that he was employed at Website Technologies, the parent company, between 2013 and 2018. (Tr. at 16:22-24.) Given that the questions asked by Salesforce would apply to all ads on Backpage.com and Mr. Conner has already testified that Backpage sold ads and that he worked at Website Technologies, these questions about the presence or absence of Backpage ads on Salesforce's servers would not implicate Mr. Conner in any criminal conduct. *None* of Salesforce's deposition questions concerned the types of conduct for which Backpage and related individuals were investigated and prosecuted—namely, Backpage's content moderation policies and internal content policies that allegedly allowed the posting of ads for commercial sex on its website and encouraged editing such ads to hide illegal prostitution.

21

- **Discussions Regarding the Creation of a Separate Instance for European and American Customers of Website Technologies**

As Mr. Conner explained, Website Technologies did not seek to evade law enforcement when it considered using a separate Salesforce instance to house data relating to some of its overseas advertisers, much less did it do so with Salesforce's help.  Previously, Mr. Conner said the "reasons" for a foreign instance "weren't anything other than simple location because we had a team working in Europe that would only contact Europeans, you know advertisers . . . if we had them all in one system [with non-European entities] things would just get crossed."  (Ex. 2 at 11:8-16.)  This mundane and unremarkable business rationale stands in stark contrast to plaintiffs' inflammatory allegations that Salesforce somehow helped Website Technologies set up a foreign instance as a means of evading law enforcement.  (*See G.G.* 4AC ¶¶ 172-173; *A.S.* FAC ¶¶ 152, 392(j); *A.B.* 4AC ¶¶ 74, 97(k); *S.M.A.* FAC ¶ 128.)   And again, this truthful answer from Mr. Conner offering a standard business reason for Backpage having a European instance is not incriminating.

- **Salesforce's Lack of Financial Assistance to Backpage**

In the October 2024 interview, Mr. Conner confirmed that Salesforce was not involved with Backpage's payment processing.  (Linsley Decl. ¶ 7.)  This statement refutes plaintiffs' allegations that Salesforce's CRM allowed Backpage to "integrate with credit card processors" and "accept payments from pimps and traffickers."  (*See, e.g.*, *A.B.* 4AC ¶¶ 81-82.)  As with other categories of questions, Salesforce's lack of involvement in this area of Backpage's operations and Mr. Conner's knowledge of that non-involvement does not incriminate Mr. Conner in any criminal conduct.

*     *     *

In sum, Mr. Conner voluntarily provided answers to several of the same questions posed in his deposition just a few months prior on two separate occasions.  Then, after being advised by

22

plaintiffs' counsel that he needed a lawyer and being provided with an attorney secured and apparently paid for by plaintiffs' counsel, he suddenly decided to invoke the privilege as to virtually all substantive questions. This is similar to what happened in *Shakman v. Democratic Org. of Cook Cnty.*, 920 F. Supp. 2d 881, 892 (N.D. Ill. 2013), where a court found a claim of privilege "undermine[d]" by the invoker's prior conduct of willingly responding to questions in earlier interviews and hearings without invoking the Fifth Amendment privilege. This Court should reach the same result here and find that Mr. Conner's prior interviews—in addition to showing that the truthful answers to Salesforce's questions will not incriminate him—significantly undermine his invocation of the privilege during his deposition.

The Court can and should review Mr. Conner's actual answers from his October 2024 and March 2025 interviews to aid in determining whether answering any of Salesforce's deposition questions in Appendix A would incriminate him. (*See* Linsley Decl. Ex. 2.) They do not. Mr. Conner's prior answers establish that he has no "valid reason" to invoke the Fifth Amendment, as his "truthful answers" do not incriminate him. *Ruiz-Cortez v. City of Chicago*, 931 F.3d 592, 603 (7th Cir. 2019); *Hoffman*, 341 U.S. at 488. And, in any event, even apart from the prior interviews, there is no plausible theory under which any of Salesforce's questions listed in Exhibit A would incriminate the witness.

As to Appendix B containing plaintiffs' questions, much of the plaintiffs' questioning at Mr. Conner's deposition constituted a transparent effort to capitalize on the witness's decision to plead the Fifth Amendment—principally by posing outlandish questions implying extreme conduct or knowledge on Salesforce's part and that they knew the witness would not answer.[1] Plaintiffs

---

[1] Salesforce reserves the right to seek alternative relief for plaintiffs' improper questions posed during the deposition of Mr. Conner, including challenging their admission at trial.

asked these types of questions not only knowing that Mr. Conner would invoke the Fifth Amendment to refuse to answer them, but also knowing from the transcript of the March 2025 interview with Mr. Connor that the premises underlying the questions were false.  Presumably, plaintiffs employed this tactic in the hope of later trying to seek some kind of adverse inference against Salesforce based on those non-answers.

Salesforce addresses the categories of the questions in Appendix B in turn, again grouping where it makes sense:

- **Mr. Conner's Alleged Communications and Interactions with Salesforce Employees and Salesforce's Alleged Assistance in Troubleshooting Issues with Software Sold to Backpage**

Throughout their portion of the Conner deposition, and in these categories too, plaintiffs' counsel repeatedly asked Mr. Conner questions that they knew he would refuse to answer and that implied facts that directly contradicted what Mr. Conner had stated previously, clearly in the hope of arguing for an adverse inference on these subjects.  For example, plaintiffs' counsel asked the following:

MR. HARRIS: Backpage used the tools and support that Salesforce sold and helped them run their illegal trafficking venture, right?

*       *       *

MR. CLIFT: Invoke the Fifth.

*       *       *

MR. HARRIS: There were many changes that had to constantly be made to allow Backpage to use the Salesforce technology in the manner that they wanted to, correct?

*       *       *

MR. CLIFT: Invoke the Fifth.

*       *       *

MR. HARRIS: The changes or modifications that were made were made with Salesforce's knowledge and assistance, correct?

*       *       *

MR. CLIFT: Invoke the Fifth.

24

(Tr. 160-61.)  All these questions implied responses that would directly contradict the answers the witness had previously provided during the interviews with Salesforce counsel, as noted above in the section regarding questions related to Salesforce's lack of involvement in implementing Website Technologies' software or customizing the software.  Mr. Conner had stated in the March 2025 interview that Salesforce did *not* customize the CRM software for Website Technologies or Backpage—specifically, that Salesforce set up the software initially and then it was left to Website Technologies to decide how they wanted to configure the software, and that Mr. Conner had done all the initial configuration and implementation himself.  (Ex. 2 at 3:2-9.)  Obviously, any adverse inference from this invocation of the Fifth Amendment on this question would be false and prejudicial to Salesforce.

In another series of questions, plaintiffs' counsel sought to paint a close relationship between Mr. Conner and Salesforce representatives, referring to potential dinners between them, "hundreds" of contacts, and a "good friendship."  (Tr. at 154:13-158:11.)  Plaintiffs presumably wanted to argue for an adverse inference here that would suggest that Mr. Conner had a close relationship with Salesforce representatives, but that too would be false.  As he stated in his March interview, Mr. Conner "never actually met [the Salesforce representatives] in person," and the relationship was "very transactional."  (Ex. 2 at 8:14, 4:1.)  Permitting plaintiffs to seek adverse inferences after asking knowingly false questions would "enable" them to "use [the] Fifth Amendment shield as a sword."  *Wehling*, 608 F.2d at 1087.  This they "cannot do."  *Id.*

- **Alleged Information Concerning Backpage Provided to Salesforce and in Public Sources**

In yet another series of questions, counsel elicited a Fifth Amendment refusal to questions about Salesforce's knowledge that, again, contradicted what Mr. Conner had said previously:

25

MR. HARRIS: Based on your personal firsthand interactions with Salesforce, would you agree with me that account executives at Salesforce knew what Backpage was using their software to do?

*      *      *

MR. CLIFT: Invoke the Fifth.

*      *      *

MR. HARRIS: And would you agree with me that it was absolutely certain that Salesforce knew that the business of Backpage was trafficking men, women and children.

*      *      *

MR. CLIFT: Invoke the Fifth.

(Tr. at 184:10-24.)  Again, as counsel well knew, the truthful answers to these questions would have been "No."  (*See* Ex. 2 at 3:23-4:15 (the relationship with Salesforce was "transactional" and there was no "back and forth" about "what your company even does"), 21:10-25 (Backpage as an advertisement site that worked with law enforcement to combat trafficking).)  Here too, the truthful "no" would not incriminate Mr. Conner.

- **Backpage's Alleged Business and Marketing** and **Backpage's Alleged Payment Difficulties and Potential European Instance**

These categories of questions focus on Mr. Conner's knowledge of Backpage's business growth and Backpage's foreign instance.  These questions are not incriminating for the same reasons as set forth above in the sections addressing the categories of "Salesforce's Lack of Involvement in Backpage's Marketing Research or Analytics," and "Discussions Regarding the Creation of a Separate Instance for European and American Customers of Website Technologies," in Appendix A, so Salesforce will not repeat the arguments here.

- **Salesforce's Alleged Knowledge Regarding Backpage's Business**

This category of questions contains three inflammatory questions from plaintiffs' counsel such as "You would agree with me that Salesforce knowingly helped Backpage traffic thousands of victims, wouldn't you?"  As detailed throughout Salesforce's position, Mr. Conner stated in previous interviews that he viewed Website Technologies and Backpage as assisting law enforcement in

26

combatting child trafficking. Although plaintiffs' extreme versions of these questions were not posed to Mr. Conner in the prior interviews, based on his previous answers to questions pertaining to Backpage's efforts with law enforcement and about his relationship with Salesforce representatives, his truthful answer to these three questions would be a resounding disagreement. Disagreeing with plaintiffs' counsel's absurd characterization of the state of facts is not incriminating, and the Court should compel Mr. Conner's response to prevent any adverse inference or prejudice to Salesforce on these questions.

For these reasons, Salesforce also asks the Court to compel Mr. Conner to answer plaintiffs' questions listed in Appendix B, truthful answers to which will neither incriminate him nor expose him to risk of prosecution and will prevent plaintiffs from distorting Mr. Conner's invocation of the Fifth Amendment privilege to create false evidence in this case.

*    *    *

At the second step of the inquiry, the Court considers whether there is a real risk of prosecution facing Mr. Conner. Because Mr. Conner cannot establish that his answers to Salesforce's questions would incriminate him, the Court need not reach the question of whether there is a "risk" that Mr. Conner would be prosecuted for that criminal conduct. *Wehling v. Columbia Broad. Sys.*, 608 F.2d 1084, 1087 n.5 (5th Cir. 1979); *Martin-Trigona*, 634 F.2d at 360 (7th Cir. 1980) (some "nexus" between the "risk" of criminal conviction and the information requested "must exist"). But any consideration of this factor overwhelmingly indicates that there is nothing but a "fanciful possibility of prosecution" against Mr. Conner. *In re Corrugated Container Anti-Trust Lit.*, 620 F.2d at 1091. Such speculative risk does not warrant the extreme step of allowing a witness to withhold relevant testimony under the cloak of the Fifth Amendment.

27

In *Shakman*, the witness invoking the privilege declined to answer nearly every question in a third-party witness deposition.  In response to a motion to compel her testimony, the witness claimed that she had a credible fear of prosecution because both civil and criminal investigations were ongoing, her County-employer had been associated with criminal prosecutions, and she had received a subpoena for grand jury testimony in the past.  920 F. Supp. 2d at 890-91.  The court in *Shakman* disagreed with each proffered reason, noting that there was no "current or pending criminal investigation" to justify her invocation of the privilege and her prior willingness to respond to questions on the same topics undercut her latter invocation.  *Id.* at 891-93.

Here, the questions Salesforce seeks to compel Mr. Conner to answer do not concern any involvement he may have had with respect to ads for commercial sex activity on Backpage.com, his knowledge regarding the presence of such ads, or whether he participated in activities that have been criminally alleged against Backpage and its senior executives, such as systematically removing terms referencing prostitution and human trafficking from advertisements—the subjects of the federal criminal investigation and prosecution, *see Lacey*, No. 2:18-CR-00422, Dkt. 230.  And, as noted, no part of the criminal prosecutions against Backpage and its senior executives involved the Salesforce CRM software or anything related thereto.  So, there is nothing in the truthful answers to Salesforce's questions that would link Mr. Conner to any of the charges advanced by the Department of Justice against Backpage and its senior executives.  And as for other types of charges, such as the sex-trafficking claims in this case, the Department of Justice thoroughly investigated Backpage for sex

trafficking crimes and concluded that such a prosecution would be unsupported by the evidence.[2] In line with this conclusion, Backpage was *never* federally prosecuted for sex trafficking.

It strains belief to suggest that Mr. Conner's testimony now, over a decade after the federal investigation closed and years after the state investigation ended, would expose him to criminal liability when he was never a person of interest even when the investigations were taking place. The five-year statute of limitations for all the charges brought against Backpage and its employees in the District of Arizona has long passed, making Mr. Conner's possible concerns of criminal liability in relation to his testimony essentially zero. *See United States v. Lacey*, No. 2:18-CR-00422, Dkt. 230; 18 U.S.C. § 1382 (requiring a five-year statute of limitations for non-capital offenses unless otherwise expressly provided by law); 18 U.S.C. § 1952; 18 U.S.C. § 1956; 18 U.S.C. § 1957. And, again, the likelihood of a criminal prosecution for a federal trafficking offense is even less than zero, given that the Department of Justice concluded that no such claim was sustainable even against senior Backpage executives who, unlike Mr. Conner, actually developed and implemented Backpage's challenged content moderation policies and were the subjects of federal criminal charges, regardless of the limitations period. *See* note 2, *supra*. Mr. Conner cannot establish any "nexus between the risk of criminal conviction and the information requested." *Martin-Trigona*, 634 F.2d at 360.

Because answering questions about Website Technologies' business relationship with Salesforce, the customization of the CRM software that Salesforce completed for Backpage, if any, and Salesforce's involvement in Backpage's marketing efforts, if any, poses (at best) "a remote and

---

[2] *See* E. Nolan, *Secret Memos Show the Government Has Been Lying About Backpage All Along*, Reason, Aug. 26, 2019, available and linked at https://reason.com/2019/08/26/secret-memos-show-the-government-has-been-lying-about-backpage/ (linking to two Department of Justice memoranda assessing possible charges against Backpage and its executives).

speculative possibility" of prosecution, *see Molina v. Transocean Deepwater, Inc.*, 2009 WL 10736478, at *6 (S.D. Tex. Dec. 28, 2009), Mr. Conner cannot invoke the Fifth Amendment as a basis for refusing to answer such questions and should be compelled to provide responses. *See Hoffman*, 341 U.S. at 487 (the court must "require him to answer" if his silence is not "justified"); *Melchor Moreno*, 536 F.2d at 1049 (reversing district court ruling that witness properly invoked self-incrimination privilege because he did not carry burden to show his testimony would expose him to "risk of prosecution"); *Hillmann*, 918 F. Supp. 2d at 779 (court finding improper deponents' invocation of the privilege to "basic factual questions" and questions "directly related to the subject of the present litigation" with "no link to the possibilities of prosecution that deponents suggest").

*    *    *

Plaintiffs spend most of their position advancing meritless arguments that Salesforce's counsel acted improperly towards Mr. Conner. Plaintiffs suggest Salesforce's counsel violated the ABA's Professional Conduct Rule 4.3, but they do not identify any "legal advice" Salesforce's counsel gave to Mr. Conner or how they supposedly "misle[]d" or "exploit[ed]" him. Notably, Mr. Conner's counsel **does not** make any of these arguments, nor is there evidence to support Plaintiffs' characterizations. It is undisputed that Mr. Conner voluntarily reached out to Salesforce's counsel months after being contacted on LinkedIn, stating that he did so because he thought the allegations he had seen against Salesforce were unfair and untrue. (Ex. 1 at 1-2; Decl. of Kristin Linsley at ¶ 6.) He offered to "help in any way." (Ex. 1 at 2.) After the initial call between Salesforce's counsel and Mr. Conner in October 2024, Mr. Conner noted that it seemed to him like Salesforce's own research into the facts had "uncovered most of what I was confirming," also stating that "[a]nything I can do to confirm the truth is worthwhile," and that "[i]f we need to speak further in the future please let me know." (*Id.* at 3.) As Plaintiffs also acknowledge, Mr. Conner was

30

unrepresented at the time of Salesforce's interviews, so there was nothing improper about Salesforce's counsel speaking with him.  Once Mr. Conner had counsel, Salesforce's counsel worked through that counsel.  Plaintiffs' unsupported suggestion that Salesforce's counsel breached ethical duties is irresponsible and wrong.

Also, as Salesforce's counsel told Plaintiffs and Mr. Conner's counsel at the time, when Salesforce's counsel remembered taking the recording of Mr. Conner's interview, they were informed of its existence.  The recording itself was made legally as Texas is a one-party consent state,  Tex. Penal Code Ann. § 16.02(c)(4), and it was made solely for the purpose of note-taking— nothing nefarious.  (Linsley Decl. ¶ 17.)   Further, Salesforce's offer to postpone the deposition of Mr. Conner to provide his counsel and opposing counsel more time to review the audio recording and transcription was turned down.  (*Id.* at ¶ 19.)  Plaintiffs cannot credibly claim prejudice now. On this point too, Plaintiffs stand alone as Mr. Conner's counsel is **not** raising any of these arguments related to the recording.

To the extent that Plaintiffs maintain their position from the meet and confer and to the extent Mr. Conner's counsel argues the same, Salesforce is not arguing that Mr. Conner waived his Fifth Amendment right, but rather that the Court can and should review Mr. Conner's prior answers from the October 2024 and March 2025 interviews—just months before his deposition—to assess the propriety of his Fifth Amendment invocation here.  As in *Shakman*, where a court found a claim of privilege "undermine[d]" by the witness's voluntary responses to questions in earlier interviews and hearings, what the witness said previously is a critical factor the court must consider.  920 F. Supp. 2d at 892 (N.D. Ill. 2013).  Controlling precedent holds that a witness cannot invoke the Fifth Amendment privilege on just their say-so:  The Fifth Amendment right is not an absolute one, *see Melchor Moreno*, 536 F.2d at 1046 ("courts cannot accept Fifth Amendment claims at face value";

31

the invoker must "establish" that their invocation was proper pursuant to this two-step framework, *see In re Corrugated Container Anti-Trust Lit.*, 620 F.2d at 109; and it is the court, not the witness, who determines if the invocation was proper after conducting the two-step inquiry, *see In re Corrugated Container Anti-Trust Lit.*, 620 F.2d at 1091 (laying out two-step inquiry); *Hoffman*, 341 U.S. at 486 ("It is for the court to say whether his silence is justified."). And the "Fifth Amendment's protection against self[-]incrimination is purely personal and may not be asserted on behalf of a third party." *Muscolino v. Landrum*, 310 F. App'x 676, 678 (5th Cir. 2009) (citing *Cal. Bankers Ass'n v. Shultz*, 416 U.S. 21, 55 (1974)). Simply put, Plaintiffs have no stake in this dispute.

As noted above, the Department of Justice evaluated and explicitly declined to pursue a § 1591 charge against Backpage, *see supra* n.2, so the lack of a limitations period does not create a real risk of prosecution for Mr. Conner. And, the limitations period for trafficking under Texas Penal Code section 20A.02 is generally 10 years. *See* Tex. Crim. Code. Proc. § 12.01(1)(G). The exceptions for an unlimited period for indictment are where the victim trafficked is a child or disabled individual and forced to engage in prostitution or pornography, or where the child or disabled invidivual becomes a victim of sexual abuse or assault, or a person receives a benefit from a venture engaged in this conduct. Tex. Penal Code § 20A.02(a)(7) and (a)(8). Again, Mr. Conner's involvement with Salesforce's CRM software—which had nothing to do with Backpage's website or any advertisements for commercial sex—does not come within the criminal conduct prohibited by these provisions.

At bottom, Plaintiffs' and Mr. Conner's counsel's position is that Mr. Conner is at risk of criminal liability because he once worked at Website Technologies, Backpage's parent. But employment at an entity that was a focus of criminal prosecutions is insufficient. *See Shakman*, 920 F. Supp. 2d at 890-91 (rejecting Fifth Amendment claim based on alleged fear of prosecution

32

because civil and criminal investigations were ongoing and witness's County-employer had been associated with criminal prosecutions).

*       *       *

For the reasons stated above, Salesforce respectfully requests that the Court enter an order compelling Mr. Conner to resubmit to be deposed and answer every question contained in Appendix A and Appendix B as well as reasonable follow-up on these questions.

## B.    MR. CONNER'S POSITION

### 1.    Summary of Argument

"*Much talking is the cause of danger. Silence is the means of avoiding misfortune. The talkative parrot is shut up in a cage. Other birds, without speech, fly freely about.*"

(Saskya Pandita, 1182-1251)

Unnamed plaintiffs have sued Defendant Salesforce, Inc. in a number of lawsuits contending generally Salesforce allowed its software and technology business to facilitate and support the trafficking of Jane Doe(s).  The trafficking of Jane Doe allegedly occurred through advertising her on Backpage "the leading online marketplace for the sale of sex and sex trafficking prior to being seized by the FBI in April of 2018."  Pl.'s 1st Am. Compl. p. 3, ¶ 7.[3]

Salesforce alleges Conner is "a former Director of Data at Website Technologies."  Mot. Compel p. 1.  Backpage is an affiliate of Website Technologies.  *Id.*  Salesforce frames part of Conner's responsibilities as follows: "Mr. Conner configured and implemented the standard business software that was the subject of a subscription agreement between Website Technologies

---

[3] Plaintiff alleges "***Technology*** has transformed the commercial sex trade, and, in the process, has contributed to the explosion of domestic sex trafficking and compelled prostitution."  Pl.'s 1st Am. Compl, p. 2-3, ¶ 6 (emphasis added).

33

and Salesforce—specifically, Salesforce's Customer Relationship Management (CRM) software …". *Id.*

Taking Salesforce's contentions and allegations regarding Conner as true, and not admitting those in any way, Conner was "the technology person" for Backpage—an entity deeply involved in promoting commercial sex and sex trafficking. If what is alleged about Backpage is true, it is entirely reasonable for Conner to invoke the Fifth Amendment regarding his position with Backpage, which is what occurred.

### 2.    Background of Backpage and Litigation[4]

Plaintiff sets out the background of Backpage and its legal issues. Important to Conner Plaintiff alleges:

- Backpage "was the largest and most notorious sponsor of commercial and coerced sex in the history of the internet" *Id.* at p. 13, ¶ 87.

- Backpage "[a]dmitted to its role in the promotion of prostitution." *Id.* at p. 18, ¶ 95.

- Carl Ferrer, Backpage's former CEO pled guilty "and admitted to his role along with Backpage.com in money laundering and the promotion of prostitution." *Id*. at p. 19, ¶ 96.

- Backpage  and/or its executives "also entered guilty pleas in the District Court for the 94th Judicial District in Nueces County, Texas. Specifically, each of the Defendants pleaded guilty to one count of Trafficking of Persons (Texas Penal Code § 20A.02) and one count of Engaging in Organized Criminal Activity (Texas Penal Code § 71.02)." *Id.* at p. 20-21, ¶ 97.

The Seventh Circuit also made some findings when reviewing the granting of a motion to dismiss, which was reversed and remanded. *G.G. v. Salesforce.com, Inc*., 76 F.4th 544 (7th Cir.

---

[4] It is understood the complaints in the four separate lawsuits for which Conner testified are similar if not identical. Some of the complaints are filed wholly or partially under seal. For purposes of these general factual allegations, the cited petition which was available through Pacer is used. As an individual not involved in these lawsuits Conner relies on the parties' allegations and sources to a large part in this response.

2023).  While it took plaintiff's allegations as true, it did make some findings which impact

Conner's analysis:

- "That Backpage committed multiple violations of Section 1591 is not in question. As discussed, Backpage violated Sections 1591(a)(1) and (a)(2) when it advertised G.G. for sale after learning that she was a minor and financially benefited from participation in her street-level trafficking." *Id.* at 553.  Section 1591 is titled *Sex trafficking of children or by force, fraud, or coercion* and includes steep imprisonment ranges, generally 10 years to life.

Other factors considered include:

- Backpage executives apparently invoked the Fifth Amendment when ordered to appear before the Senate Permanent Subcommittee on Investigations.  Ex. A.

- James Larkin, a former Backpage executive, committed suicide before he was to stand trial in Arizona for his role in Backpage.  Ex. B.

- It is understood Salesforce deponents invoked the Fifth Amendment during their depositions.  Conner does not have the transcripts or the full context of the invocations and points this out solely to point out to the Court Conner is not the only concerned individual.

Bottom line is Backpage and anything (or anyone) associated with it is surrounded by criminal

prosecutions.

On August 8, 2025, Salesforce also sought to stay proceedings until all the criminal matters

involving Backpage and its executives were resolved.  Ex. C (*G.G. v. Salesforce Inc.*, No. 1:20-

CV-2335, N.D. Ill, E.D., Doc. 254).  In its motion it sets out the pending criminal cases (*Id.* at p.

1) and summarizes the criminal matters as involving facilitation of prostitution and money

laundering "all brought against former executives and employees of Backpage."  *Id.* at 2.

Salesforce acknowledges "The overlap here between the criminal and civil proceedings is direct

and substantial: both arise from the same alleged conduct by Backpage and its executives ..." *Id.*

The motion is replete with other observations along the same lines and even includes a heading

(and argument) "The Criminal Proceedings and This Action Arise From the Same Occurrence." *Id*. at p. 9.

Despite all this, Salesforce has selected Mr. Conner to try and force him to testify regarding his involvement at Backpage over his invocation of his Fifth Amendment Rights.

### 3.    <u>Conner may Face Prosecution under a Number of Criminal Statutes</u>

Conner's alleged role as the IT person at Backpage implicates federal and state criminal statutes.  For example, the federal sex trafficking statute which is the underpinning of Plaintiff's claims is in play.  It provides:

> (a)Whoever knowingly—
>
> > (1) in or affecting interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States, recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; or
> >
> > (2) benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1), knowing, or, except where the act constituting the violation of paragraph (1) is advertising, in reckless disregard of the fact, that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act, or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act, shall be punished as provided in subsection (b).

18 U.S.C. § 1591.

Texas criminal statutes may also be implicated.  *See* Tex. Penal Code § 20A.02 (Trafficking of Persons); § 71.02 (Organized crime statute).  Certain parts of section 20A.02 do not have a limitations period.  *Id.* at 12.01(1)(G).  These are only a few.  Mr. Conner cannot know what other state or federal statutes may be used to bring a criminal complaint against him.

### 4. **Conner's Right to Invoke the Fifth Amendment**

In Texas, the privilege against self-incrimination "prevails over the civil justice system's needs" unless it is "perfectly clear" information sought "cannot possibly have [any] tendency to incriminate." *In re Peters*, 699 S.W.3d 307, 310 (Tex. 2024). As stated by the Texas Supreme Court: "The privilege against self-incrimination applies to testimony that could directly incriminate a witness or furnish an evidentiary link that might tend to incriminate hi *Id*. at 310. *Peters* was a dram shop action. In *Peters*, the issue was whether the court could compel a driver who rear-ended the plaintiffs to identify the bars that served him alcohol. *Id*. at 309. Peters refused to answer and invoked his Fifth Amendment rights. The court held that answering the question could "furnish a link in the chain of proof that might tend to incriminate him." *Id*. at 311. The court further noted that "[a]ctive criminal proceedings are not required to claim the privilege." *Id*. at 311. Also, the court addressed the contention Peters waived the privilege by speaking with a police officer. *Id.* The court noted Peters must have made a " voluntary, knowing, and intelligent waiver of privilege" in speaking with the police officer to lose the privilege. *Id.* The court found he did not.

In the Fifth Circuit, ""[A] witness may properly invoke the Fifth Amendment 'privilege against compulsory self-incrimination ... "in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory" when he [or she] "reasonably apprehends a risk of self-incrimination, ... though no criminal charges are pending against him [or her], ... ***and even if the risk of prosecution is remote***." ' " *Doe v. Louisiana*, 2 F.3d 1412, 1419 n.14 (5th Cir. 1993) (emphasis added).

5.    **Conner Properly Invoked His Fifth Amendment Rights**

As set out above, the parties frame Conner's alleged position with Backpage as the IT person. Backpage was a website where prostitution and trafficking allegedly occurred. Backpage's CEO admitted to such. Criminal proceedings are continuing. If it is true Backpage promoted prostitution and trafficking, Conner was the technology person for a criminal enterprise. As such, ***his role alone*** presents the real probability of criminal prosecution. At a minimum, testifying regarding his role furnishes "a link in the chain of proof that might tend to incriminate him." *Id.* at 311. It is impossible to "put the toothpaste back in the tube" if he testifies, under oath regarding his IT role with Backpage.

6.    **Specific Responses to Salesforce's Other Claims/Contentions/Allegations**

A.    **Conner's Counsel Is Not Bought And Paid For**

Salesforce's counsel takes a swipe at the undersigned basically claiming the advice provided to Conner was bought by Plaintiff's counsel. Mot. to Compel, p. 15 ("Then, after being advised by plaintiffs' counsel that he needed a lawyer and being provided with an attorney secured and paid for by Plaintiffs' counsel, he suddenly decided to broadly invoke the privilege.") The offense taken by the baseless allegation cannot be overstated. However, despite the unwarranted attack against the undersigned, it deserves little response. Plaintiff's counsel is not paying for Conner's attorney's fees. However, *both sets of counsel* for the parties recently agreed to pay for Conner's time and his attorneys' fees.

B.    **C**onner Did Not Waive His Fifth Amendment Rights When Interviewed By Salesforce

Conner did not waive his right to invoke the Fifth Amendment. Conner did not "suddenly decide to invoke the privilege." Conner's deposition was set for May 7, 2025. On April 23, 2025, the undersigned emailed all counsel notifying them he was representing Mr. Conner and asked it

38

be re-set.  Ex. D (April 23, 2025, email to counsel).  After that time, he received pleadings and

participated in calls with both sets of counsel.  He specifically asked not to be provided any work

product or specific documents.

Apparently, Conner was interviewed by Salesforce's counsel before the undersigned's

involvement.  Apparently, Salesforce's Texas counsel recorded him at least once.  Mot. to Compel,

p. 8.  Conner was not represented by counsel until a subpoena was issued for his deposition—well

after the timing of the referenced interviews.  Nothing in the record indicates Conner, as an IT

professional, was aware of the potential implications in speaking with any counsel or how it could

impact him criminally.    Nothing in the record establishes he knowingly waived his Fifth

Amendment rights.   The undersigned could not make that decision until after receiving the

pleadings, reviewing certain orders, and participating in calls with each side's counsel.

### C. *The framework for the Court to analyze Conner's invocation leads to determine he did so properly*

Conner does not dispute, generally, the legal framework in which this Court will use to

analyze his invocation of the Fifth Amendment.  The undersigned, up front, told counsel Conner

intended to invoke his Fifth Amendment right at the deposition outside of "name, rank, and serial

number."  After much wrangling in this Court, and Conner sitting in the undersigned's office until

after lunch, the first deposition was canceled.  Conner sat for the second deposition  Conner did

answer questions that did not concern his alleged role at Backpage.

Salesforce frames its argument that no criminal prosecutions or investigations into

Salesforce or its CRM software use at Backpage are pending.  In this report it sets out the types of

questions it seeks answered (basically to get the response "Salesforce did not do …") with the goal

of getting the answer "Backpage/Mr. Conner did …"  Joint Rpt. P. 4-8.  Conner is not concerned

whether Salesforce is subject to criminal prosecution or an investigation. The sole issue is whether his alleged role as the IT professional at Backpage, an admitted criminal organization, may subject him to prosecution. Conner has a legitimate concern and right to invoke the Fifth Amendment, which he did, regardless of how remote.

Salesforce cites *Molina* in an attempt to establish its belief Conner testifying to his alleged role at Backpage only presents a remote and speculative possibility of prosecution, and that is the standard. Mot. to Compel, p, 17-18, *Molina* involved whether an individual was required to produce his tax returns and how Federal Rule of Evidence 608(b) applied. It is inapplicable to this situation. However, the Fifth Circuit's pronouncement is applicable. *See Doe*, 2 F.3d at 1419 n.14.

### 7.    Review of Salesforce's Exhibits A and B

Salesforce provides the Court with two exhibits which set out the questions it asks the Court to order Conner to answer. The entire problem with Conner responding to questions is his alleged role at Backpage. If he was the IT person for a Backpage which ran a website that promoted prostitution and sex trafficking it is impossible for him to admit his role and the extent of that role without being implicated. Each question regarding his role as the IT professional is one link in the chain to criminal prosecution. Even more difficult is if Conner is forced to answer questions regarding this IT role, the "cut-off" before "the link" to criminal prosecution is unknown entirely.

The undersigned closely reviewed Exhibits A and B a few times. He also conferred with Salesforce's counsel regarding this motion. Conner simply cannot respond to the questions without potentially implicating himself. All questions implicate his alleged role of operating the back-end, IT operations of Backpage.

Salesforce complains of Plaintiff's counsel's questioning.  Mot. to Compel p. 18-20. Salesforce may have issues with Plaintiff's counsel's questions, but not liking the questions is no ground to force Conner to waive his Fifth Amendment rights.

One other overall issue is Salesforce questioning Conner about the interviews it conducted and the recording of one of them.  Conner should not be ordered essentially to adopt or prove up the interview under oath.  Doing so simply is an end-run around his Fifth Amendment rights.

8.    **The Parties are in Possession of Backpage's and Salesforce's Information**

It is understood that through discovery the parties are in possession of emails and other communications between or among Backpage and Salesforce.  Conner is identified as author or recipient on certain emails.  The parties already have substantial evidence regarding the relationship between Backpage and Salesforce.  Conner should not be forced to waive his Fifth Amendment rights for these civil lawsuits where other evidence exists to establish much of the case.  Salesforce also has its own people who can testify.

9.    **Conclusion**

Conner and his counsel worked with the parties' attorneys in the lawsuits at issue in an effort to provide the testimony requested.  Unfortunately, Conner's alleged role at Backpage implicates a number of criminal statutes.  Compelling Conner to testify regarding what he may have done while at Backpage as an IT professional opens Conner up to potential criminal liability for those activities.  Therefore, Conner respectfully requests the Court deny Salesforce's motion.

C.    **PLAINTIFFS' POSITION**

The underlying action in this case arises under the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1595 and the Texas Civ. Prac. & Rem. Code § 98. Plaintiffs brought this civil action to hold Defendant Salesforce accountable for knowingly

41

providing software and technology that allowed Backpage to sustain and expand its trafficking enterprise.

The present dispute centers on Salesforce's attempt to compel testimony from Patrick Conner, a former Backpage employee who served as its Director of Data and acted as Salesforce's primary point of contact from 2014 until Backpage's seizure by the FBI in 2018. At his August 15, 2025 deposition, Mr. Conner answered numerous questions but, on advice of counsel, invoked his Fifth Amendment privilege against self-incrimination as to others. Salesforce now seeks an order forcing Mr. Conner to waive this constitutional protection.

Salesforce's motion should be denied. Mr. Conner's alleged role at Backpage exposes him to ongoing criminal liability under federal and state law. His invocation of the Fifth Amendment was both proper and necessary. Moreover, Salesforce's own conduct, including 1) secretly recording Mr. Conner while unrepresented, 2) failing to disclose those recordings, and 3) mischaracterizing opposing counsel's role, further undermines the fairness of its request. Constitutional law, ethical rules, and fundamental fairness all compel denial of Salesforce's motion.

## 1.    **Background**

### A.    **Backpage's Criminal Enterprise**

Backpage was never the exemplary organization secretly trying to fight online trafficking that Salesforce now strains to portray. To the contrary, it was in fact universally recognized as the internet's largest facilitator of prostitution and sex trafficking. In 2012, the National Association of Attorneys General, representing 51 attorneys general, characterized Backpage as the "hub" of

"human trafficking, especially the trafficking of minors",[5] while in 2015, major financial institutions (including payment processors Visa and Mastercard) severed ties due to Backpage's criminal business model.[6] In 2016, the United States Senate issued a report concluding Backpage "knows that it facilitates prostitution and child sex trafficking."[7] This all culminated in 2018 when Backpage and its CEO Carl Ferrer pled guilty to felony sex trafficking of a minor.[8]

Federal and state prosecutions followed. Ferrer, along with other executives, entered plea agreements for sex trafficking and money laundering. Founders James Larkin and Michael Lacey faced trial: Larkin tragically committed suicide on the eve of trial in July 2023, and Lacey was convicted in 2024 and is now appealing. Additional executives were convicted of conspiracy, Travel Act violations, and money laundering. *See United States of America v. Michael Lacey, et al*, No. CR-18-00422-0001-PHX-DJH (D. Az. April 23, 2024).

This history makes plain: association with Backpage exposes individuals to severe criminal liability.

**B.    Mr. Conner's Role**

During the relevant period, Mr. Conner was Backpage's Director of Data and served as its primary liaison with Salesforce. Salesforce itself characterizes him as the person who implemented and managed its Customer Relationship Management ("CRM") software for Backpage. By Salesforce's own description, Mr. Conner was the "technology person" responsible for integrating the very systems Plaintiffs allege enabled Backpage's sex trafficking venture. Given Backpage's

---

[5] https://www.naag.org/wp-content/uploads/pdfs/sign-ons/Backpage.com-FINAL-9-16-11.pdf

[6] https://www.cnn.com/2015/07/02/news/visa-mastercard-backpage-prostitution

[7] https://www.hsgac.senate.gov/wp-content/uploads/imo/media/doc/Backpage%20Report%202017.01.10%20FINAL.pdf

[8] https://www.congress.gov/114/bills/sres377/BILLS-114sres377ats.pdf

43

admitted criminality, it is not surprising that Mr. Conner is concerned his role would carry obvious exposure to prosecution.

## C.    The Conner Deposition

On August 15, 2025, Mr. Conner was deposed pursuant to subpoena. Counsel for Mr. Conner notified all parties in advance that he would invoke the Fifth Amendment to questions implicating his role at Backpage. During the deposition, Mr. Conner answered basic questions but properly asserted his privilege to avoid self-incrimination.

Critically, _on the day before the deposition_, Salesforce disclosed for the first time that its lawyers had previously interviewed Mr. Conner on two occasions, months prior, both while he was unrepresented. They had secretly recorded at least one call. Salesforce had not revealed these interviews during weeks of negotiations surrounding Mr. Conner's deposition, nor had it produced the recording despite specific requests. This concealment and misconduct directly bear on the credibility of Salesforce's motion.

## 2.    **Legal Standard**

The Fifth Amendment declares that "[n]o person…shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. This privilege applies "in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory," where a witness "reasonably apprehends a risk of self-incrimination." _Doe v. Louisiana_, 2 F.3d 1412, 1419 n.14 (5th Cir. 1993).

The Supreme Court has long held that the privilege must be accorded "liberal construction in favor of the right it was intended to secure." _Hoffman v. United States_, 341 U.S. 479, 486 (1951). It extends not only to answers that would directly support a conviction but also to those furnishing a "link in the chain of evidence needed to prosecute." _Id._; _Blau v. United States_, 340 U.S. 159, 161

44

(1950). Courts do not require active criminal proceedings; it is enough that testimony presents more than a "fanciful possibility" of prosecution. *In re Folding Carton Antitrust Litig.*, 609 F.2d 867, 871 (7th Cir. 1979).

Texas law is equally protective: the privilege prevails "unless it is perfectly clear" the testimony cannot possibly tend to incriminate. *In re Peters*, 699 S.W.3d 307, 310 (Tex. 2024).

### 3.    <u>Argument</u>

### A.    Mr. Conner Faces Real and Ongoing Criminal Exposure

Salesforce asserts that the statute of limitations bars prosecution. That is wrong. Under 18 U.S.C. § 3299, there is no statute of limitations for sex trafficking offenses under § 1591. Texas Penal Code § 20A.02 (Trafficking of Persons) likewise carries no limitation for certain offenses. Many states toll limitations until survivors reach the age of majority.

Thus, Mr. Conner remains subject to criminal liability for his activities at Backpage. His testimony about implementing Salesforce software would directly implicate him as a participant in a criminal enterprise.

### B.    Salesforce's Conduct Violates Ethical Rules and Undermines Its Motion

Salesforce's conduct toward Mr. Conner has been improper at every stage of this dispute and demonstrates why its motion to compel should be denied. Each action taken by Salesforce not only raises ethical concerns but also underscores the unfairness of compelling testimony from a witness who faces genuine criminal exposure.

Salesforce admits that it interviewed Mr. Conner on two separate occasions while he was unrepresented by counsel and that, during one of these interviews, it recorded the conversation without his knowledge or consent. This conduct squarely violates the spirit, if not the letter, of

Model Rule of Professional Conduct 4.3, which prohibits lawyers from misleading or exploiting unrepresented third parties.[9] Specifically, this rule states:

> In dealing on behalf of a client with a person who is not represented by counsel, a lawyer shall not state or imply that the lawyer is disinterested. When the lawyer knows or reasonably should know that the unrepresented person misunderstands the lawyer's role in the matter, the lawyer shall make reasonable efforts to correct the misunderstanding. The lawyer shall not give legal advice to an unrepresented person, other than the advice to secure counsel, if the lawyer knows or reasonably should know that the interests of such a person are or have a reasonable possibility of being in conflict with the interests of the client.

*Id.* Mr. Conner likely (and reasonably) believed that Salesforce, a company he worked closely with throughout his time at Backpage, was acting in good faith when it initiated these discussions. In reality, Salesforce's counsel sought to advance its own litigation interests at the expense of an unrepresented individual who had no legal protection at the time. Such tactics are fundamentally inconsistent with the duties of fairness and candor that govern all attorneys appearing before this Court.

Compounding this initial misconduct, Salesforce then concealed the existence of these interviews and the secret recording during weeks of deposition negotiations with Plaintiffs and Mr. Conner. Despite Plaintiffs' repeated requests for information regarding prior communications with Mr. Conner, Salesforce withheld this critical fact until the day before his deposition was scheduled to proceed. This lack of transparency deprived both Plaintiffs' counsel and Mr. Conner's

---

[9]

https://www.americanbar.org/groups/professional_responsibility/publications/model_rules_of_professional_conduct/rule_4_3_dealing_with_unrepresented_person/comment_on_rule_4_3/. The same rule is found in Texas - https://www.texasbar.com/AM/Template.cfm?Section=Home&ContentID=67638&Template=/CM/ContentDisplay.cfm and California - https://www.calbar.ca.gov/Portals/0/documents/rules/Rule_4.3-Exec_Summary-Redline.pdf

counsel of the ability to evaluate the circumstances of the interviews in advance, raising questions about what was asked, how the recording was obtained, and what legal implications it carried. Only at the last possible moment did Salesforce reveal its actions, a tactic that smacks of gamesmanship rather than fair litigation practice.

Finally, Salesforce now seeks to use the very recordings it secretly obtained as a springboard to compel Mr. Conner's live testimony. By asking the Court to force Mr. Conner to confirm or "adopt" statements made during these interviews, Salesforce attempts an end-run around his constitutional privilege against self-incrimination. The law is clear that the Fifth Amendment protects against not only direct admissions of guilt but also testimony that would furnish a "link in the chain of evidence" leading to prosecution. *Hoffman v. United States*, 341 U.S. 479, 486 (1951). Forcing Mr. Conner to authenticate or validate the contents of undisclosed, improperly obtained recordings would eviscerate the very protection the privilege is designed to provide. The Court should not permit Salesforce to benefit from its own misconduct by compelling testimony that the Constitution forbids.

## C.    Salesforce Already Possesses the Evidence it Seeks to Extract from Mr. Conner

The parties already possess extensive documentary evidence, including emails, communications, and testimony from Salesforce's own employees concerning the Backpage–Salesforce relationship. Forcing Mr. Conner to waive his Fifth Amendment rights is both unnecessary and unconstitutional.

### 4.    <u>Conclusion</u>

Patrick Conner's alleged role as Backpage's technology lead plausibly places him at genuine risk of criminal liability under federal and state trafficking statutes. His invocation of the

47

Fifth Amendment was likely proper, and Salesforce's motion to compel is unsupported by law or fact.

Worse still is Salesforce's conduct toward Mr. Conner: secretly recording him, then attempting to exploit the resulting transcripts by inserting them into publicly filed court documents like the Motion to Compel herein. Coupled with its failure to disclose and its baseless accusations, this pattern reflects serious ethical lapses by Salesforce. The Court should not allow such tactics.

During the conferral process, there was no middle ground to me made given the gravity of the criminal implications for Mr. Conner if he chooses to testify further than what he already has.

For these reasons, Plaintiffs respectfully request that the Court deny Salesforce's Motion to Compel Further Deposition from Third-Party Witness Patrick Conner.

DATED:  October 14, 2025                       Respectfully submitted,

    /s/    *Gregory M. Clift*            */s/  Kristin A. Linsley*

Rogge Dunn (State Bar No. 06249500)    John T. Cox III (Tex. Bar No. 24003722)

Gregory M. Clift (State Bar No.          Andrew LeGrand (Tex. Bar No. 24070132)

00795835)                      GIBSON, DUNN & CRUTCHER LLP

ROGGE DUNN GROUP, P.C.          2001 Ross Avenue, Suite 2100

500 N. Akard Street, Suite 1900       Dallas, TX 75201

Dallas, TX 75201               Telephone: 214.698.3100

Telephone: (214) 888-5000        Email: TCox@gibsondunn.com

Facsimile: (214) 220-3833          ALeGrand@gibsondunn.com

Email: dunn@RoggeDunnGroup.com

     Clift@RoggeDunnGroup.com     Kristin A. Linsley

                          (*admitted pro hac vice*)

Attorneys for James Patrick Conner   GIBSON, DUNN & CRUTCHER LLP

                          One Embarcadero Center, Suite 2600

                          San Francisco, CA 94111

                          Telephone: 415.393.8395

                          Email: KLinsley@gibsondunn.com

By: /s/ *Annie McAdams*

ANNIE MCADAMS, PC
Annie McAdams
State Bar No. 24051014
S.D. Tex. No. 1514589
2900  North Loop West, Suite 1130
Houston, Texas 77092
Telephone: (713) 785-6262
Facsimile: (866) 713-6141
teamamc@mcadamspc.com

          and

By: /s/ *David E. Harris*

SICO HOELSCHER HARRIS LLP
David E. Harris
State Bar No. 24049273
S.D. Tex. No. 712461
Craig M. Sico
State Bar No. 18339850
S.D. Tex. No. 13540
819 N. Upper Broadway
Corpus Christi, Texas 78401
Telephone: (361) 653-3300
Facsimile: (361) 653-3333
dharris@shhlaw.com
csico@shhlaw.com

Attorneys for Plaintiffs

  /s/ Afia Bondero

Afia Bondero
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Ave.
Los Angeles, CA 90071
Telephone: 213.229.7786
Email: abondero@gibsondunn.com

Attorneys for Defendant Salesforce, Inc.

SECOND JOINT REPORT REGARDING MOTION TO COMPEL FURTHER DEPOSITION TESTIMONY
FROM THIRD-PARTY WITNESS

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 14th day of October, 2025, the foregoing document was served on Plaintiffs' counsel of record and counsel for Mr. Conner in the above-styled litigation.

<u>*/s/ Kristin Linsley*</u>
Kristin Linsley

50